ROBERT A. CHAISSON, Judge.
12Pefendant, Robert Tassin, seeks review of his second degree murder conviction. Having thoroughly reviewed the record as well as the briefs submitted by all parties, we find no merit to the arguments presented by defendant herein, and accordingly, we affirm his conviction and life sentence.

PROCEDURAL HISTORY

A Jefferson Parish Grand Jury indicted defendant, Robert Tassin,' his wife Georgina Tassin, and Sheila Mills for the first degree murder of Edward Martin in 1986. The State later reduced the charges against Georgina Tassin and Sheila Mills to armed robbery. On May 8,1987, a jury found defendant guilty of first degree murder and unanimously sentenced him to death. On dmect appeal to the Louisiana Supreme Court, defendant’s conviction and sentence were affirmed. State v. Tassin, 536 So.2d 402 (La.1988), cert. denied, 493 U.S. 874, 110 S.Ct. 205, 107 L.Ed.2d 159 (1989).
lain 2007, pursuant to a petition for a writ of habeas corpus, the Eastern District Court of Louisiana granted defendant relief and vacated his first degree murder conviction. Tassin v. Cain, 482 F.Supp.2d 764 (E.D.La.2007). The State of Louisiana sought review in the United States Fifth Circuit Court of Appeals, which affirmed the district court’s ruling. Tassin v. Cain, 517 F.3d 770 (5th Cir.2008).
On February 5, 2009, a Jefferson Parish Grand Jury indicted defendant with the second degree murder of Edward Martin in violation of LSA-R.S. 14:30.1. On February 9, 2009, defendant was arraigned and entered a plea of not guilty to the charge. The matter proceeded to trial on November 30, 2010, before a twelve-person jury. After considering the evidence presented, the jury, on December 10, 2010, unanimously found defendant guilty as charged.
On January 14, 2011, defendant filed a motion for new trial, which the trial court denied on January 18, 2011. Also on that day, defendant waived sentencing delays, and the trial court sentenced him to life imprisonment without benefit of parole, probation, or suspension of sentence. Defendant now appeals.

FACTS

In November of 1986, Wayne Stagner was working as a deckhand on a river tugboat with his captain, Eddie Martin, the victim in this case. After finishing the day’s work on November 5,1986, Mr. Martin and Mr. Stagner disembarked between 5:00 and 6:00 p.m. and proceeded to Schnell’s Restaurant in Marrero to cash their paychecks. Afterward, they went across the street to the Shady Lady Lounge for a few beers. While there, Mr. Martin met Sheila Mills. After several hours in the bar, Mr. Martin and Mr. Stagner exited the bar, planning to go back to the boat. As they walked to Mr. Martin’s two-door grey Thunderbird, Ms. Mills approached and asked Mr. Martin if *1241 he wanted to buy some cocaine. After Mr. | ¿Martin said “yes,” Ms. Mills went back into the lounge in an apparent attempt to acquire cocaine, but she was unsuccessful. Ms. Mills returned outside and joined the two men in Mr. Martin’s car. Mr. Martin drove, Ms. Mills sat in the middle of the front seat, and Mr. Stagner sat on the passenger side of the front seat.
The three proceeded to another bar in Avondale to obtain cocaine, but were unsuccessful. Ms. Mills then directed Mr. Martin to a friend’s house where she thought they could acquire cocaine. They proceeded down Highway 90, turned on to Laroussini Street, and stopped in front of a white house. Mr. Martin had given Ms. Mills some money to purchase one-half gram of cocaine. While Mr. Martin and Mr. Stagner waited in the car, Ms. Mills approached the house, knocked on a window, and spoke with Georgina Tassin.[1] Ms. Tassin informed Ms. Mills that she and her husband, defendant, did not have cocaine, but they had access to Dilaudid. Ms. Mills entered the house, where she told the Tassins that the two men she was with had just come ashore, were loaded with money, and were going to treat her to drugs.
The Tassins told Ms. Mills that they would obtain the drugs if she bought some for them too. Ms. Mills returned to the car and spoke with Mr. Martin outside of the car, while Mr. Stagner remained seated inside. As a result of their conversation, Mr. Martin apparently gave Ms. Mills some more money, and she returned inside. Around this time, Mr. Stagner placed his money in his shoe and asked to hold Mr. Martin’s money there too. Mr. Martin gave his money to Mr. Stagner, who put it in his other shoe.
Inside the house, after Ms. Mills handed over the money to defendant, he paged his drug connection, went out the back door, obtained Dilaudid on the corner, and returned inside. Ms. Mills and the Tassins then injected the Dilaudid. | .¡According to Ms. Tassin, after shooting up the Dilaudid, the three discussed a plan about acquiring a gun from some friends and taking the rest of Mr. Martin’s and Mr. Stagner’s money; however, Ms. Mills denied that there was ever a discussion or plan to commit an armed robbery. Ms. Mills and the Tassins then returned to Mr. Martin’s car and asked him to give them a ride to their friends’ house to buy the cocaine. Mr. Martin agreed and was directed to the Tres Vidas apartment complex in Gretna, the home of Mary Ann Valverde and her boyfriend, Darryl Macaluso.
The Tassins went inside that apartment, and at some point, were joined by Ms. Mills. According to Ms. Tassin, defendant went into the bedroom with Ms. Valverde. However, Ms. Valverde[2] maintained that defendant did not enter her bedroom that night, that defendant asked her for some syringes which she provided to him, and further, that no one in her apartment owned or possessed a gun. In contrast to this testimony, Mr. Macaluso, who was not home at the time of the Tassins’ visit, claimed that he kept a gun in the bedroom of his apartment and that his gun was in the apartment when he left on November 5, 1986. Mr. Macaluso further stated that he retrieved his gun the next day from defendant’s house.
After about 15 minutes inside Ms. Val-verde’s apartment, Ms. Mills, Ms. Tassin, *1242 and defendant returned to the car, where defendant asked Mr. Martin to give him a ride back home. Mr. Martin agreed. Defendant got into the back seat behind Mr. Martin, the driver, while Ms. Tassin got into the back seat behind Mr. Stagner. Ms. Mills returned to the front seat between Mr. Martin and Mr. Stagner. During the ride, Ms. Mills complained she was feeling nauseous and asked Mr. Martin to pull over. Mr. Martin complied and stopped the car in a dark area under the Lapalco Bridge.
16Ms. Mills exited the car and walked to the rear. According to Mr. Stagner, after a few minutes, he reached up on the dashboard to get his cigarettes when he heard a “pow” and saw a “red flash.” He looked over his left shoulder to see defendant rapidly shoot Mr. Martin three times in the back of the head, “blowing off’ a part of the victim’s face. Mr. Stagner opened his door to get out when he heard another shot. Mr. Stagner ran behind the car; even though he had been shot in his left shoulder and left leg, he managed to flee the scene and get help.
After Mr. Stagner escaped, Mr. Martin’s body was removed from the car, and his pockets were checked for money. However, no money was found. Mr. Martin’s body was rolled into a ditch,[3] and the three got into Mr. Martin’s car and fled. With Ms. Mills driving, they returned to the Tassins’ house. Defendant then left to dispose of the gun and the car. Upon his return, defendant told his wife that he threw the gun in the Mississippi River and drove the car into the Westwego Canal.
Mark Helton, a former homicide detective with the Jefferson Parish Sheriffs Office, led the investigation in this case. After examining the scene, he proceeded to West Jefferson Hospital, where Mr. Stagner was in serious condition. Mr. Stagner initially told detectives that he and Mr. Martin had picked up some hitchhikers who robbed them.
Soon after the incident, Linda Kelly, a patron at the Shady Lady Lounge on the night of November 5, 1986, came forward and informed Detective Helton that she had seen Mr. Martin and Mr. Stagner leave the bar with “Sheila.” Further | ./investigation revealed that Sheila’s last name was “Mills.” Ms. Kelly was shown a photographic lineup from which she identified Ms. Mills.
On November 7, 1986, Detective Helton confronted Mr. Stagner about the hitchhiker version of events, and Mr. Stagner admitted that it was a fabrication. Mr. Stagner then identified Ms. Mills from a photographic lineup. Based on the information obtained from Mr. Stagner and Ms. Kelly, Detective Helton obtained an arrest warrant for Ms. Mills, and she was subsequently arrested.
As Mr. Stagner’s health gradually improved, Detective Helton obtained permission from his doctor for Mr. Stagner to ride in an ambulance with the detective and direct him to all the places he and Mr. Martin had been to that night. During this ride, Mr. Stagner pointed out the house on Laroussini Street where he and Mr. Martin first met the Tassins. With this address, Detective Helton acquired *1243 defendant’s and his wife’s names, and warrants were issued for their arrests. After hearing on the news that they were wanted for the murder, the Tassins, on November 12, 1986, turned themselves in to the police.
Several months after the incident, defendant’s father contacted the police with the location of the victim’s car. In March of 1987, Mr. Martin’s car was retrieved from Bayou Segnette, within a couple miles of defendant’s house. The keys were in the “on” position and the car was in the “drive” gear, indicating that the car was driven directly into the water. A subsequent search of the vehicle revealed an apparent bullet hole in the dashboard area of the front passenger compartment, an apparent bullet hole in the roof of the car just to the left of the driver’s seat, and a bullet fragment.
In addition to lay witnesses, numerous expert witnesses testified at trial. Ronald Singer, the defense expert in crime scene reconstruction, reviewed photographs of the recovered car and opined that the shots that killed the victim |sdid not originate from directly behind the victim, but rather slightly from the right. He determined that the gunman was not sitting directly behind the victim, but rather, was positioned to the right. Mr. Singer premised this opinion on the location of the bullet hole in the roof of the car, which was to the left of the driver’s seat.
Colonel Timothy Scanlan, the Crime Lab Director for Jefferson Parish Sheriffs Office and an expert in the fields of crime scene reconstruction, firearms and tool marks, and blood stain pattern analysis, disagreed with aspects of Mr. Singer’s analysis. His basis for disagreement was that the condition of the crime scene precluded any definitive findings. Colonel Scanlan explained that the extensive damage the car sustained by being dumped in the bayou and left there for five months significantly altered the conditions under which the crime occurred and thus rendered difficult the ability to accurately determine ballistics’ trajectories and angles. Notably, Colonel Scanlan disagreed with Mr. Singer’s determination that the shooter was not in the rear seat directly behind the victim and that the hole in the roof of the car was in fact a bullet hole.
Dr. Joseph Warren, an expert in the fields of forensic biology and forensic serology and a former employee of the Jefferson Parish Sheriffs Office Crime Lab, performed blood typing and enzyme level analysis in the present case. Dr. Warren analyzed a brown pullover shirt worn by Mr. Stagner on the night of the incident and determined that human blood was present and that the shirt contained ana-genic activity, i.e., blood-typing chemistry, which was consistent with the blood types of Mr. Stagner (Type 0), the victim (Type 0), and defendant (Type A). Dr. Warren added that Type A, defendant’s blood type, is found in 40% of the population.
19Pr. Warren further explained that ana-genic activity can be detected in bodily fluids other than blood, such as perspiration and saliva. Thus, from the presence of anagenic activity with blood Type A on Mr. Stagner’s shirt, it can be inferred that a person with that blood type transferred biological material by means of blood, saliva, or perspiration. However, the doctor could not say that the anagenic activity on Mr. Stagner’s shirt was transferred by means of blood. He acknowledged that it would be possible for this biological material to have been transferred by a person in a nightclub or by a person rendering aid to Mr. Stagner after he had been injured.
The defense expert, Ronald Singer, opined that based on the blood types found on Mr. Stagner’s shirt, there was contact between someone who was Type 0 and *1244 someone who was Type A, such as Mr. Stagner and defendant. However, on cross-examination, Mr. Singer acknowledged the lack of evidence to establish that defendant bled while in contact with Mr. Stagner.
Having set forth the procedural history and facts, we now turn our attention to the arguments raised by defendant in both his counseled and pro se appellate briefs.

DENIAL OF CAUSE CHALLENGE OF PROSPECTIVE JUROR

(Assignments of Eiror Numbers I, 2, and 3)

On appeal, defendant first argues that his rights to due process, an impartial jury, the free exercise of all peremptory challenges, and a full voir dire were violated when the trial court denied his challenge for cause of a prospective juror who displayed contempt for the proceedings and expressed bias against the defense.
During questioning by defense counsel, one prospective juror, Victor Marsiglia, expressed that the defense would have “trouble” with him. He | inexplained that he had practiced law for 20 years and has an “extremely low” opinion of the criminal justice system. Mr. Marsiglia also indicated that it would be hard for him to listen to and respect other jurors.
Based on Mr. Marsiglia’s statement that he would be trouble, defendant sought to strike Mr. Marsiglia for cause. The trial court denied counsel’s challenge, finding Mr. Marsiglia had “a complete disregard for the process as a whole, not as to the Defendant, but as to the entire system as a whole.” The court acknowledged Mr. Marsiglia’s statement that he would be “trouble” for the defense, but pointed out his other statement that he could be fair. The court observed:
... [H]e definitely doesn’t want to be here. And he’s doing everything he can to get off. I considered all the totality of his answers and everything, and what I came back to was the one where he said, If you asked him to, could he be fair and considerate?, and he said, Yes’.
The defense subsequently utilized a peremptory challenge to strike Mr. Marsiglia. Defendant now contends that the trial court erred in denying his challenge for cause of Mr. Marsiglia who displayed a complete disregard for the proceedings and expressly admitted bias against the defense. Defendant further contends that this error was compounded by the trial court’s denial of defendant’s request to further question Mr. Marsiglia about his bias.
The Sixth Amendment to the United States Constitution guarantees the accused the right to a trial by an impartial jury. State v. Anderson, 06-2987 (La.9/9/08), 996 So.2d 973, 995, cert. denied, 556 U.S. 1165, 129 S.Ct. 1906, 173 L.Ed.2d 1057 (2009); State v. Munson, 12-327 (La.App. 5 Cir. 4/10/13), 115 So.3d 6, 12. Further, Article I, § 17 of the Louisiana Constitution guarantees the right to full voir dire examination of prospective jurors and the right to challenge those jurors peremptorily. LSA-C.Cr.P. art. 797 allows the defendant or the State |nto challenge a juror for cause on the ground that he is not impartial or that he will not accept the law as given to him by the court. LSA-C.Cr.P. art. 797(2) and (4).
A challenge for cause should be granted, even when a prospective juror declares the ability to remain impartial, if the juror’s responses as a whole reveal facts from which bias, prejudice, or inability to render a judgment according to law may be reasonably implied. However, a prospective juror’s seemingly prejudicial response is not grounds for an automatic *1245 challenge for cause, and the trial court’s refusal to excuse the juror on the ground that he is not impartial is not an abuse of discretion, if after further questioning the potential juror demonstrates a willingness and ability to decide the case impartially according to the law and evidence. State v. Lindsey, 06-255 (La.1/17/07), 948 So.2d 105, 108; State v. Wilson, 09-170 (La.App. 5 Cir. 11/10/09), 28 So.3d 394, 406-07, writ denied, 09-2699 (La.6/4/10), 38 So.3d 299.
In ruling on challenges for cause, the trial judge is vested with broad discretion; his ruling will be reversed only when a review of the entire voir dire reveals that the judge’s exercise of discretion was arbitrary and unreasonable with resultant prejudice to the accused. This is necessarily so because the trial court has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questioning by the parties’ attorneys. Such expressions and intonations are not readily apparent at the appellate level where a review is based on a cold record. State v. Munson, 115 So.3d at 12.
To prove an error warranting reversal of both the conviction and sentence, a defendant must show that he has exhausted all of his peremptory challenges and that the trial court erroneously denied a challenge for cause. State v. Michel, 07-47 (La.App. 5 Cir. 5/29/07), 961 So.2d 516, 522, writ denied, 07-1422 (La.1/7/08), 973 So.2d 732. In the instant case, the record reflects that defendant exhausted his | ^peremptory challenges; however, defendant has failed to show that the trial court abused its discretion by denying his challenge for cause of Mr. Marsiglia.
In the instant case, Mr. Marsiglia clearly did not want to serve on the jury, and he clearly had a low opinion of the criminal justice system. However, looking at the voir dire as a whole, there is no indication that Mr. Marsiglia could not be fair or could not follow the law. Mr. Marsiglia’s comment that the defense would have trouble with him was made in the following context:
MS. LEBOEUF:
So, so what’s terrible to you about— let me go through. If you are told that another jury voted to convict, can you say to yourself, “That’s not my— that’s not — that”—the Judge will tell you that’s no part of your consideration. Can you do that?
MR. MARSIGLIA:
I could, yeah. That wouldn’t be your — that wouldn’t be your only trouble with me, though, I wouldn’t think.
MS. LEBOEUF:
And when you say “your only trouble,” you mean the defense?
MR. MARSIGLIA:
Yeah. Right.
MS. LEBOEUF:
Yeah, okay, well I appreciate that. And then, you know — can you imagine a world where you’re Mr. Tassin sitting at the jury — at the—
MR. MARSIGLIA:
I would be very upset if I were innocent.
MS. LEBOEUF:
And it’s been twenty-four years.
MR. MARSIGLIA:
I would be very upset if I were innocent, in his place.
| iaMS. LEBOEUF:
Okay.
But when you say, I the defense, we the defense, have a problem with you, it sounds to me like you—
MR. MARSIGLIA:
*1246 I thought — you didn’t ask the right question soon enough. I’m a — I practiced law for twenty years,—
MS. LEBOEUF:
Uh-huh—
MR. MARSIGLIA:
—do you really want me?
MS. LEBOEUF:
You do real estate now?
MR. MARSIGLIA:
Now I do, yes ma’am.
MS. LEBOEUF:
Okay, you don’t practice at all?
MR. MARSIGLIA:
Not at all.
MS. LEBOEUF:
Okay. And, I mean I think that the question that we’re asking you, and I know this then better than most of the other members of the jury, is that, if you cannot set aside preconceptions, in your somewhat jaundiced view of the criminal justice system, that you perhaps should not be a juror?
MR. MARSIGLIA:
If — if I could have avoided coming here today by telling the Judge that, I would have.
MS. LEBOEUF:
Uh-huh.
luTHE COURT:
It wouldn’t have worked.
MR. MARSIGLIA:
That’s okay, Judge, but I’m just trying to let everybody know what, you know, may be my disqualification now.
Taken in context, the trouble that Mr. Marsiglia was referring to was the fact that he was a lawyer and had practiced law for 20 years. Mr. Marsiglia clearly thought defense counsel would have a problem with the fact that he was a lawyer and further thought that his lawyer status would automatically disqualify him from jury duty. Thus, this comment about “trouble” in no way indicates that Mr. Marsiglia would be biased against the defense.
Clearly, his responses indicate that any bias he had was against the process as a whole, not just the defense. Pursuant to voir dire questioning, Mr. Marsiglia noted that the prosecutors, just like the defense, can have a motive to lie. Also, when asked about the fact that this case is from 1986, Mr. Marsiglia stated, “It’s disturbing if somebody’s not been brought to justice sooner than that.... It hadn’t been brought to any kind of resolution, I mean, some family’s really upset, or, ... some innocent man’s been on trial too long. Look at it either way.”
In support of his argument that his challenge for cause was improperly denied, defendant points out that the trial court’s ruling was actually based on an answer that the prospective juror did not give. In particular, defendant disputes the trial court’s finding that Mr. Marsiglia answered he could be fair and considerate. Defendant maintains that Mr. Marsiglia was not asked this question, but rather was asked the far narrower one of whether he could wait until all the evidence was presented before determining guilt or innocence. The transcript indicates defense counsel’s question was as follows:
|is... [T]he law presumes [defendant] innocent. And that lasts not till after the first witness testifies, not till after the second witness testifies; it lasts until the Judge sends the jury back to deliberate. That presumption of innocence lasts through every single witness, questioned and answer by both sides, argument, and the Judge’s instruction. Can you do that?
Mr. Marsiglia responded, ‘Yeah, I guess so.”
*1247 The transcript indicates that defense counsel did not ask Mr. Marsiglia whether he could be fair and considerate as suggested by the court. Nonetheless, such a question is implicit in the question posed by defense counsel, and the prospective juror’s answer likewise permits the reasonable inference that he in fact could be fair and considerate. Defense counsel asked whether the jurors could uphold defendant’s presumption of innocence throughout the entire trial. Mr. Marsiglia responded that he could. Moreover, pursuant to a comment made by Mr. Marsig-lia, it is evident that he thought that he had already promised to be fair.
As part of this argument, defendant also contends that the trial court improperly restricted defense counsel’s questioning of Mr. Marsiglia with regard to his bias. The record does not support this assertion. After challenging Mr. Marsiglia for cause, defense counsel asked to question him further. The court denied this request, finding that the venire of which Mr. Marsiglia was a member had already been subjected to voir dire for two hours. We find no error in the trial court’s denial of defendant’s request. As noted by the trial court, the venire had been subjected to extensive voir dire. Moreover, the record indicates that after Mr. Marsiglia first admitted he would be “trouble” for the defense, defense counsel had ample opportunity to further investigate this apparent bias. Immediately after stating that he would be “trouble” for the defense, defense counsel posed several more questions directly to Mr. Marsiglia. Then, defense counsel returned to question Mr. Marsiglia several more times, the last question being whether he |16could uphold defendant’s presumption of innocence, to which Mr. Marsiglia replied that he could.
Based on the foregoing, we find that the trial court did not abuse its broad discretion in denying defendant’s challenge for cause or in refusing defendant’s request to further question Mr. Marsiglia about his bias. Thus, the arguments raised by defendant in these assignments of error are without merit.

SELF-DEFENSE JURY INSTRUCTION

(Assignments of Error Numbers 4 and 5)
In his next appellate argument, defendant contends that the trial court erred in denying his request to instruct the jury on self-defense. Defendant asserts that he presented significant evidence to support his theory of self-defense, and thus, the trial court’s refusal to give his requested charge violated his rights to due process, to trial by'jury, and his rights under LSA-C.Cr.P. arts. 802 and 807.
LSA-C.Cr.P. art. 802 mandates that the trial court instruct the jury on the law applicable to each case. The trial court is required to charge the jury on the law applicable to any theory of defense, when properly requested, which the jurors could reasonably infer from the evidence. State v. Cornejo-Garcia, 11-619 (La.App. 5 Cir. 1/24/12), 90 So.3d 458, 462.
LSA-C.Cr.P. art. 807 mandates that a requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly pertinent and correct. The evidence presented at trial must support the requested special charge. State v. Cornejo-Garcia, 90 So.3d at 462-63. Failure to give a requested jury instruction constitutes reversible error only when there is a miscarriage of justice, prejudice to the substantial rights of the accused, or a substantial violation of a constitutional or statutory right. State v. Lawson, 08-123 (La.App. 5 Cir. 11/12/08), 1 So.3d 516, 527.
*1248 |17In the present case, we find that the evidence presented at trial did not support defendant’s self-defense claim, and therefore, the trial court did not err in refusing to give the requested self-defense charge. At trial, there was no testimony that defendant acted in self-defense. In fact, to the contrary, several witnesses testified that defendant did not act in self-defense.
Mr. Stagner testified that neither he nor the victim conducted themselves in a hostile manner toward Ms. Mills, Ms. Tassin, or defendant that night. Neither one of them was armed that night, and neither one asked the three for anything of value or attempted to take drugs from them.
In Ms. Tassin’s post-arrest interview with Detective Helton, she did not indicate that she, Ms. Mills, or defendant was the victim of an attempted armed robbery or that her husband acted in self-defense. At trial, Ms. Tassin again testified that neither the victim nor Mr. Stagner said or did anything toward herself, Ms. Mills, or defendant that could have been construed as threatening.
Colonel Scanlan testified that the victim’s wounds did not indicate that defendant acted in self-defense and that no physical evidence indicated self-defense. Indeed, this Court has found evidence that the victim has been shot in the back of the head does not support a claim of self-defense. See State v. Patterson, 10-415 (La.App. 5 Cir. 1/11/11), 63 So.3d 140, 149, writ denied, 11-0338 (La.6/17/11), 63 So.3d 1037. Moreover, defendant’s failure to report the shooting, his disposal of the gun and car, and his flight from the scene were also inconsistent with a theory of self-defense.
In his argument, defendant points to several pieces of evidence that support his self-defense claim and that would justify the giving of the self-defense instruction. Specifically, defendant points to the presence of defendant’s blood type on Mr. Stagner’s shirt, the scar on the webbing of defendant’s hand, the “wide |isspread of bullets around the car,” the defense expert’s conclusion that shots were fired not from directly behind the driver but slightly from the right, Mr. Stagner’s initial untruthful statement to the police regarding hitchhikers, and the testimony that defendant did not have a gun and that there was no plan of armed robbery as consistent with his acting in self-defense.
We have thoroughly considered these claims presented by defendant and conclude that the evidence which defendant alleges entitled him to a self-defense instruction, when viewed with all the other evidence, does not permit a reasonable inference that defendant acted in self-defense. As noted by the trial court in denying defendant’s request for the jury instruction, “there was nothing to support [that] the victim was in any way a threat to the defendant.” In the present case, self-defense was a hypothetical argument lacking any supporting evidence, and therefore, the trial court did not err in refusing to instruct the jury on self-defense. See State v. Lawson, 1 So.3d at 527-28 (where this Court likewise found that the evidence at trial did not support a claim of self-defense, and therefore, the trial court did not err in refusing to give the requested special jury charge on justifiable homicide).
Moreover, despite the exclusion of self-defense from the jury instructions, the record indicates that the jury was informed of the theory in defense counsels opening statement and closing argument. In the opening statement, counsel intimated a theory of self-defense when she suggested that Mr. Stagner or the victim had a gun. Counsel then reinforced this theory when she stated that Mr. Stagner *1249 pulled out a gun, defendant lunged for it, grabbed it, and wedged his hand in the firing mechanism, preventing it from discharging. She explained that defendant then wrested the gun away from Mr. Stag-ner and fired it, striking the ] 19victim and Mr. Stagner. Counsel observed that defendant responded the way a reasonable person would “respond to a gun in his face.”
Then, in closing argument, defense counsel again suggested a theory of self-defense when she asked, “... [W]as there a struggle in that car or was it a planned execution style killing?” Counsel continued, “The physical evidence supports but does not prove that the shots were fired not from directly behind Mr. Martin in the drivers seat but ... more towards the middle of the car as if someone had moved forward in response to a provocation....” Counsel asserted that Mr. Stagner had the gun and that Mr. Stagner was the “provocation.”
Thus, even if the trial court erred in excluding self-defense from the jury instructions, such error was harmless since the jury was presented with defendant’s theory of self-defense. Based on the foregoing, we find no merit to the arguments raised by defendant in these assignments of error.

PROSECUTORIAL MISCONDUCT

(Assignments of Error Numbers 6 and 7)

In defendant’s next two assignments of error, he argues that his rights to counsel, due process, and a fair trial were violated when the prosecutor attacked defense counsel’s integrity and denigrated the defense throughout trial. Defendant argues that the trial court erred in permitting this to occur when it overruled defense objections, refused to give a remedial instruction, and denied requests for a mistrial.
The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. Consequently, the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused. Smith v. Phillips, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982); State v. Ortiz, 11279920 (La.1/29/13), 110 So.3d 1029, 1034, cert. denied, — U.S. -, 134 S.Ct. 174, 187 L.Ed.2d 42 (2013). While a prosecutor should prosecute with “earnestness and vigor” and “may strike hard blows, he is not at liberty to strike foul ones.” Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).
We note at the outset that the prosecutor’s conduct during the trial went beyond the bounds of “earnestness and vigor.” George Wallace, the prosecutor, at times, clearly made inappropriate and unprofessional comments. In fact, the State, in its appellate brief, acknowledged that his comments were “injudicious.” However, for the reasons that follow, we find that these comments and unprofessional conduct did not affect the fairness of defendant’s trial and therefore do not require the reversal of defendant’s conviction.

Prosecutor’s remarks regarding defense counsel’s impeachment of Ms. Tassin

In his argument regarding prosecutorial misconduct, defendant first contends that the prosecutor improperly undermined defense counsel’s efforts to impeach Ms. Tas-sin by intimating defense counsel employed unethical tactics and encouraged the witness to change her story. For example, during the State’s direct examination of Ms. Tassin, the prosecutor questioned Ms. Tassin about whether anyone had encouraged her to change her story *1250 from previous testimony in years past. The prosecutor questioned her as follows:
[STATE]:
Who, if anyone has ever attempted to get you to say something differently, or specifically, about what happened that night under that bridge? Who, if anybody’s, attempted to do that?
[MS. TASSIN]:
Robert Tassin.
[STATE]:
The Defendant, Robert Tassin?
_[2j[MS. TASSIN]:
Yes.
[STATE]:
And the Defendant’s attorney ... isn’t that true?
The court sustained defense counsel’s objection to this last question. Subsequently, the prosecutor asked, “Anything else that you can recall that someone may have helped your memory on, about that night under the bridge, or the events leading up to that night under the bridge? Anybody else help your memory along a little bit?” Ms. Tassin responded, “No, not that I can remember.” The prosecutor then asked, “And as between the two sides of this courtroom, who was trying to help your memory for you?” The court overruled defense counsel’s objection. The inquiry resumed:
[STATE]:
... [W]ho has been trying to help your memory?
[MS. TASSIN]:
The Defense of Robert Tassin.
[STATE]:
Who has ever suggested what you should say about the events that night?
The court sustained defense counsel’s objection. Then, on cross-examination, while questioning Ms. Tassin in regard to a statement she gave to Detective Helton, defense counsel asked her if she had told a specific fact to the detective, which Ms. Tassin disputed at trial. When the prosecutor asked defense counsel for a page reference in the statement to where Ms. Tassin told the detective the alleged fact, defense counsel stated, “It’s not in this statement.” The prosecutor retorted, “Oh. Did you make it up?” Defense counsel objected. The court then admonished both parties for improper remarks, and defense counsel moved for a mistrial on the basis that | ^defendant had been deprived of his right to a fair trial. The court denied the motion.
Finally, on redirect examination, the prosecutor asked Ms. Tassin, “Did the Defense ever contact you, and suggest things that may have happened?” Defense counsel objected and requested a remedial instruction. The court sustained the objection, but did not offer an instruction.
LSA-C.Cr.P. art. 775 provides, in pertinent part, “[u]pon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.” A mistrial is a drastic remedy and is warranted only when trial error results in- substantial prejudice to defendant that deprives him of a reasonable expectation of a fair trial. Whether a mistrial should be granted is within the sound discretion of the trial court, and the denial of a motion for mistrial will not be disturbed absent an abuse of discretion. State v. Chairs, 12-363 (La.App. 5 Cir. 12/27/12), 106 So.3d 1232, 1244, writ denied, 13-0306 (La.6/21/13), 118 So.3d 413.
In United States v. Jones, 839 F.2d 1041, 1049-50 (5th Cir.1988), cert. denied, *1251 486 U.S. 1024, 108 S.Ct. 1999, 100 L.Ed.2d 280 (1988), the Fifth Circuit considered a similar scenario where the prosecutor had accused defense counsel of suborning perjury. The court addressed whether this amounted to reversible error, considering three factors: the magnitude of the prejudicial effect of the statement, the efficacy of any cautionary instructions, and the strength of the evidence of the defendant’s guilt. The court determined that the prosecutor’s comment, “while it no doubt impugned the integrity of [defense counsel], had little chance of affecting the determination of guilt.” The court based this conclusion on several factors: the jury had ample reason to disbelieve [the witness] even in the absence of the | ^¡prosecutor’s accusatory statements, the prosecutor’s comments struck at an aspect of the case that had little bearing on guilt, the judge immediately issued a curative instruction for the jury to ignore the prosecutor’s comment, and the prejudicial effect of the comment was outweighed by the other evidence of guilt.
Likewise, in the instant case, the jury had ample reason to disbelieve Ms. Tassin in the absence of the prosecutor’s remarks. The jury was aware of Ms. Tassin’s drug habit, her role in the crime, and the leniency she received in exchange for her testimony against defendant. In addition, although the judge did not issue a curative instruction, he did sustain several of defense counsel’s objections, preventing the prosecutor from further pursuing the challenged line of questioning and avoiding an unequivocal statement by Ms. Tassin that defense counsel encouraged her to change her story. Further, the jury was instructed prior to and at the conclusion of trial that statements and arguments of counsel are not evidence. In addition, the prejudicial effect of the prosecutor’s comments was outweighed by the other evidence of defendant’s guilt.
For these reasons, we find that the prosecutor’s remarks did not render it impossible for defendant to obtain a fair trial, and thus, the trial court did not abuse its discretion in denying defendant’s motion for mistrial on this basis or in overruling some of defense counsel’s objections and declining to issue a remedial instruction.

Prosecutor’s conduct during bench conferences and throughout trial

In addition to complaining about prosecutorial misconduct during defense counsel’s impeachment attempts of Ms. Tassin, defendant further complains about other remarks made by the prosecutor throughout the trial and during bench conferences. In particular, defendant claims that the prosecutor repeatedly argued objections in a sarcastic way before the jury instead of privately at the bench, ^suggesting to jurors that counsel was unprofessional and inept; that he interrupted defense questioning with patronizing comments; and that he explicitly accused defense counsel of impropriety and incompetence during bench conferences. With regard to the bench conferences, defendant argues that the high volume of the prosecutor’s “angry” voice made it likely that the jury heard his disparaging remarks, and he points to the several times the court admonished the prosecutor for his loud voice. In addition, he notes the repeated reprimands of the prosecutor by the trial court support- his claim of prose-cutorial misconduct.
Obviously, Mr. Wallace acted inappropriately and unprofessionally and had a difficult time controlling his comments as reflected by the trial court’s following warnings to him:
You know what, Mr. Wallace, let me tell you something. I don’t know how you come in Court and practice; ... [b]ut I don’t appreciate the comments *1252 anymore, okay? And I’m going to warn you one more time. Okay? There’s a three strike limit. The next time you do it, they’ll have your mug shot.... But if you can’t control the comments, to yourself, and breath in before you say anything, okay. The next time there isn’t going to be any warning from me. It’s just going to be done. Do we understand each other?
At a later point, the trial court issued another stern reprimand:
Mr. Wallace, do you have issues controlling your emotions? ... [T]hen why do you make comments to Counsel, with the Jury in the box? Why do you do that? Didn’t we have this discussion a day or two ago? ... [W]hy do you continue to do it? ... I don’t want the comments, you see? ... [Yjou’re adversarial parties, I understand that. But you don’t need to bring it to a level that we’re in a barroom at two o’clock in the morning. I don’t want the Jury to get that impression ... They don’t need to hear these comments.... You’re supposed to be the State of Louisiana. You’re supposed to be above comments, okay?
While the prosecutor’s various jibes at defense counsel throughout trial were clearly ill-advised, we find that they did not render it impossible for defendant to obtain a fair trial, especially in light of the strong evidence of defendant’s guilt. Moreover, any prejudicial effect these comments may have had was limited by the hsjury instructions prior to and at the conclusion of trial that statements and arguments of counsel are not evidence. Thus, we conclude that this complained of prosecutorial misconduct does not warrant reversal of defendant’s conviction.

Prosecutorial misconduct during the State’s closing rebuttal argument

As part of his claim of prosecuto-rial misconduct, defendant lastly argues about comments made by Mr. Wallace during the State’s closing rebuttal argument. The alleged misconduct commenced in the opening of the prosecutor’s rebuttal where he attacked the integrity of the criminal defense profession: “There are those who will defend a lot to serve what they perceive to be a greater purpose of the oppressive state of the rights of the accused. There’s no purpose great or small in this world or the next [that] is ever served by a lie.” The alleged misconduct continued when the State undermined defendant’s presumption of innocence by the prosecutor’s reference to him as “the man who robs and kills under a bridge” and “a coldblooded killer.”
Defendant also challenges the prosecutor’s use of a metaphor, in which he likened accepting the defense’s theory to drinking Kool-Aid: “They drank the Kool-Aid and now they are offering it to you.... Take a sip of Kool-Aid.” Defendant further challenges the prosecutor’s references to the defense theory as a “fairy tale,” “cock and bull story,” “make believe Marvil (sic) comics foolishness,” “nowhere close to reasonable,” “laughably ridiculous,” and “offensive.”
Defendant further claims that the prosecutor was unwarranted in his efforts to undermine the credibility of the defense’s case by improperly suggesting defense counsel misled the jury by utilizing otherwise properly introduced photographs and transcribed testimony of unavailable witnesses. The prosecutor continued targeting defense counsel as “that lawyer with scorn and disdain written all over her face just dripping from her mouth as she asked questions” and “theJjjbest witness the Defense had.” The prosecutor suggested that it would have been understandable for Mr. Stagner to choke defense counsel for her cross-examination of him.
*1253 At the conclusion of the State’s argument, defense counsel moved for a mistrial on the basis that the State’s closing argument denigrated defendant’s right to counsel. The court denied the motion.
It is well-settled that a prosecutor has considerable latitude in making closing arguments. However, this latitude is not without limits. State v. Pierce, 11-320 (La.App. 5 Cir. 12/29/11), 80 So.3d 1267, 1277. Indeed, LSA-C.Cr.P. art. 774 provides:
The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case. The argument shall not appeal to prejudice. The state’s rebuttal shall be confined to answering the argument of the defendant.
In addition, the prosecutor should refrain from argument which tends to divert the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions of the consequences of the jury’s verdict. State v. Messer, 408 So.2d 1354, 1356 (La.1982). The prosecutor should also refrain from making personal attacks on defense strategy and counsel. State v. Simmons, 98-841 (La.App. 5 Cir. 6/1/99), 738 So.2d 1131, 1140, vrrit denied, 99-2419 (La.4/20/00), 760 So.2d 333. Nevertheless, a conviction will not be reversed because of improper argument unless the reviewing court is firmly convinced that the remarks influenced the jury and contributed to the verdict. State v. Pierce, 80 So.3d at 1277. In making this determination, the appellate court should give credit to the good sense and fair-mindedness of the jury that has seen the evidence and heard the argument, and has been instructed that the arguments of counsel are not ^evidence. State v. Robertson, 08-297 (La.App. 5 Cir. 10/28/08), 995 So.2d 650, 660, writ denied, 08-2962 (La.10/9/09), 18 So.3d 1279. The Louisiana Supreme Court has commented that it “seldom reverses convictions on the basis of prosecutorial argument (because jurors are generally told repeatedly that they must decide the case on the evidence and that arguments of counsel do not constitute evidence).” State v. Duplessis, 457 So.2d 604, 610 (La.1984).
In State v. Simmons, 738 So.2d at 1140, this Court found that the prosecutor’s remarks during rebuttal were improper when he stated that “it frankly never ceases to amaze me about the moral rectitude and indignation and sanctimonious foolishness that can be mustered up by defense lawyers trying to get their client off.” He continued, “[I]t is amazing the sense of civic responsibility that some lawyers can muster when they’re trying to get a murderer out of prison. Talk about your oxy-morons.” Notably, the prosecutor in the instant case is the same prosecutor that was being complained about in the Simmons case. Nevertheless, this Court found the remarks were not so inflammatory or prejudicial as to warrant reversal of the defendant’s conviction.
Likewise, we find that the prosecutor’s remarks in the instant case, while outside the scope of rebuttal argument and improper, were not so inflammatory or prejudicial as to warrant reversal of defendant’s conviction. As noted previously, the jury was instructed prior to and at the conclusion of trial that statements and arguments of counsel are not evidence. Moreover, notwithstanding the prosecutor’s remarks, there was overwhelming evidence of defendant’s guilt. Thus, we find no abuse of discretion in the trial court’s denial of defendant’s motion for mistrial on *1254 the basis of prosecutorial misconduct during the State’s argument.
| gain sum, we have considered very seriously the allegations of prosecutorial misconduct which was displayed by Mr. Wallace throughout the course of the trial. As noted at the beginning of this discussion, Mr. Wallace’s behavior at times was inappropriate and unprofessional. Our ultimate determination however is that the prosecutor’s remarks did not affect the fairness of the trial and further did not contribute to the verdict. Thus, we conclude that the prosecutor’s misconduct does not warrant reversal of defendant’s conviction. These assigned errors are without merit.

MISLEADING TESTIMONY OF GEORGINA TASSIN

(Assignments of Error Numbers 8, 9, and 10)

In defendant’s next assignments of error, he argues that his rights to due process, a fair trial, and to present a defense were violated when the State failed to correct the alleged misleading testimony of Ms. Tassin regarding the plea deal she received in exchange for her testimony against defendant. He specifically contends that the jury was misled by Ms. Tassin’s testimony at the second trial that no promises were made to her to obtain her testimony at defendant’s first trial or in the instant trial. By this assignment, defendant essentially re-urges the argument upon which he obtained federal habe-as relief.
In Tassin v. Cain, 482 F.Supp.2d at 770, the federal court discussed the requirements of the Napue, Giglio, and Brady cases as follows:
The Supreme Court has interpreted Fourteenth Amendment due process protections to require a new trial when convictions are obtained through material evidence known to be false by representatives of the State. Giglio v. United States, 405 U.S. 150, 153-54, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). This is true regardless of whether the State solicits false testimony or merely allows testimony which it knows to be false to go uncorrected. Giglio, 405 U.S. at 153, 92 S.Ct. 763; Napue, 360 U.S. at 269, 79 S.Ct. 1173. The rule extends to evidence going to the credibility of a witness when that witnesses’s (sic) testimony is material to the case. Giglio, 405 U.S. at 154, 92 S.Ct. 763. ‘Any understanding or agreement as to a future | goprosecution would be relevant to [the witness’s] credibility and the jury [is] entitled to know of it.’ Id. at 155, 92 S.Ct. 763. In addition, when the prosecution has evidence favorable to a defendant in its possession it must produce that evidence. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The evidence need not be exculpatory; a constitutional violation also occurs when material impeachment evidence is withheld. U.S. v. Bagley, 473 U.S. 667, 676-83, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).
Relying on these cases, the federal court, on March 23, 2007, granted defendant’s application for habeas relief and vacated his May 8,1987 conviction for first degree murder based on the misleading nature of Ms. Tassin’s testimony and the State’s failure to correct it. In deciding to reverse defendant’s conviction, the federal court determined that the standard guiding its inquiry was not whether Ms. Tassin had lied about a firm promise. This is because, the court explained, Giglio “did not place the focus on technicalities and did not require a promise hidden by perju *1255 ry before due process concerns are implicated.” Rather, the court noted, “it is more important for credibility determinations that a witness has been offered the possibility of leniency, but not promised it....” Tassin v. Cain, 482 F.Supp.2d at 771.
With this standard in mind, the federal court found:
While Judge Karno may not have promised to sentence Georgina Tassin to 10 years, he made representations to Georgina’s counsel and the prosecutor that were firm enough for her to treat those representations as reliable. Judge Karno conditioned his agreement to consider a 10-year sentence on the consistency of Georgina Tassin’s testimony, encouraging her understanding that she was being asked to perform certain conduct in return for certain consideration. The likelihood of a 10-year sentence was sufficient to lay to rest the concerns of her attorney and herself that she could face 99 years despite her willingness to testify favorably for the State.
Tassin, 482 F.Supp.2d at 772.
The federal court noted that at defendant’s first trial, Ms. Tassin testified that she could receive a sentence of up to 99 years, that she did not know whether her testimony would affect her sentencing, and that no promises were made to her lanconcerning her testimony. Despite the technical accuracy of these statements, the court found this testimony created “a false impression” for the jury. In reversing defendant’s conviction, the federal court stated that whether a firm promise or an assurance that a specific sentence would be considered, Ms. Tassin was offered “inducements” for her testimony of which the jury was not made aware. “The prospect of a 10-year sentence was in her mind as she testified against her husband, and it is with such influences that Giglio is concerned.” Tassin, 482 F.Supp.2d at 778.
Because the jury was not made aware of these influences, the court found the jurors were misled. This, in conjunction with the court’s determination that Ms. Tassin’s testimony was material, was the basis for the court’s reversal of defendant’s conviction. Tassin, 482 F.Supp.2d at 775.
At defendant’s second trial, Ms. Tassin testified and was questioned about any deals with the State. Defendant once again challenges his conviction based on the misleading nature of Ms. Tassin’s testimony and the State’s failure to correct that testimony. In particular, defendant alleges that the following testimony misled the jury:
[STATE]:
Was any promise or inducement made to obtain your testimony, by anyone in the District Attorney’s office, in [defendant’s] first trial or now?
[MS. TASSIN]:
No, I never had any promises.
Defense counsel objected, and the following discussion outside the presence of the jury was held:
[STATE]:
I think we can resolve this with — by asking a single question, ... “Did the State of Louisiana reduce the charges against you from first degree murder and attempted first degree |31 murder to armed robbery in exchange for your testimony in connection with your husband’s case?”
[THE COURT]:
... [T]hat would be truthful.
[DEFENSE]:
That would be truthful. Also would be truthful, that she was told that her *1256 sentencing cap would be around ten years. That would be truthful as well.
[[Image here]]
[THE COURT]:
... I don’t have a problem with [the State] asking that question, to this witness. I will sustain your objection as to the first question.
The State resumed:
[STATE]:
... [D]id the State of Louisiana ever reduce the charges of first degree murder and attempted first degree murder, which were originally made against you in connection with this case, in exchange for your testimony in the case against Robert Tas-sin?
[MS. TASSIN]:
Yes, sir.
[STATE]:
No further questions.
Then, pursuant to questioning by defense counsel on cross-examination, Ms. Tassin acknowledged that she testified at defendant’s first trial pursuant to a deal with the State and that she knew her charge would be reduced. When questioned about the agreed upon sentence, she denied being promised ten years. She testified that she was hoping it would be ten years, but that she was never actually promised ten years. With regard to her sentence, she testified, “I was given a few different numbers. I was told ten years, I was told thirty, I was told fifty, I was told ninety-nine. But ... my hopes went with the ten; but I was never promised anything.”
Defendant argues that Ms. Tassin’s testimony left the jury with the false impression that she had nothing to gain by her testimony at defendant’s first trial. |32This argument is not supported by the record. To the contrary, Ms. Tassin explicitly stated that the charges against her were reduced in exchange for her testimony against defendant and that ten years was a possibility on the reduced charge. Further, the jury was informed that Ms. Tas-sin, in fact, received a ten-year sentence on the reduced charge. Given this testimony, we find that the jury was not misled by Ms. Tassin’s testimony and was made aware of all facts that might motivate a witness in giving testimony.
Defendant further suggests, in a listed assignment related to this argument, that the trial court erred by refusing to instruct the jury about (a) the true terms of the plea deal which Ms. Tassin received in return for her testimony against defendant at the first trial, and (b) the fact that she lied under oath about it at the first trial. Given that the jury was advised that Ms. Tassin received a reduced charge, that there was a possibility of a ten-year sentence, and that she received a ten-year sentence, we likewise find no merit to this argument.

MOTION TO EXCLUDE GEORGINA TASSIN’S TESTIMONY

(Assignment of Error Number 11)

In defendant’s eleventh assignment of error, he argues that his rights to due process, to a fair trial, and to present a defense were violated when the trial court denied his motion to exclude Ms. Tassin’s testimony. Defendant points out that at his second trial, Ms. Tassin did not testify with the motivation to secure leniency, since she had already received and served a ten-year sentence; thus, defendant was prevented from impeaching Ms. Tassin on the grounds that her testimony at the second trial was motivated by leniency. Since defendant was prevented from impeaching Ms. Tassin at his first trial due to the State’s concealment of her *1257 deal, | ¡^defendant was altogether unable to impeach Ms. Tassin. As a result, defendant argues Ms. Tassin should not have been allowed to testify at his second trial.
In Napue v. People of State of Ill. and Giglio v. United States, supra, the cases upon which the federal court reversed defendant’s original conviction, the United States Supreme Court found the appropriate remedy for violations like the one in the present case was a reversal of the defendant’s conviction. In neither case did the Court find that the exclusion of the evidence from a subsequent trial was warranted.
In Napue, supra, the defendant’s conviction of murder was obtained, in large part, as a result of the testimony of a co-defendant, who had previously pled guilty and had been sentenced to 199 years. The co-defendant testified at trial that he had received “no promise of consideration” in return for his testimony. However, the defendant later learned that his co-defendant in fact had been offered the possibility of leniency in exchange for his testimony against the defendant, and so sought post-conviction relief, in which he alleged that his co-defendant had falsely testified that he had been promised no consideration for his testimony and that the prosecutor had known this to be false. The state habeas court denied relief and the Illinois Supreme Court affirmed. On certiorari, the United States Supreme Court reversed the lower courts, finding that “the false testimony used by the State in securing the conviction of petitioner may have had an effect on the outcome of the trial.” Napue, 79 S.Ct. at 1179. In so doing, the Court did not make mention of the co-defendant being precluded from offering testimony in any subsequent trial.
Similarly, in Giglio, supra, the defendant’s conviction of forgery was obtained, in large part, on the testimony of a co-conspirator, who participated in the forgery scheme but was not indicted. At trial, the co-conspirator testified that he had received no promise of leniency in exchange for his testimony. The |34defendant was convicted and, while his appeal was pending, his counsel discovered evidence indicating that the State had failed to disclose an alleged promise to the co-conspirator that he would not be prosecuted if he testified for the State. The defendant filed a motion for new trial based on newly discovered evidence, which the district court denied. On certiorari, the United States Supreme Court found:
Here the Government’s case depended almost entirely on [the co-conspirator’s] testimony; without it there could have been no indictment and no evidence to carry the case to the jury. [The co-conspirator’s] credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it.
Giglio, 92 S.Ct. at 766.
For these reasons, the Court found a new trial was required and accordingly reversed the defendant’s conviction and remanded the matter. In so doing, the Court made no mention of the co-conspirator being precluded from offering testimony at the new trial.
Likewise, in the instant case, we find that the constitutional violations in defendant’s first trial caused by Ms. Tassin’s misleading testimony were remedied by the reversal of defendant’s conviction and the granting of a new trial. Defendant has not provided any support for his claim that he is entitled to the additional relief he now requests. We further note that although Ms. Tassin had already fulfilled her ten-year sentence, defense counsel was given the opportunity to thoroughly cross- *1258 examine Ms. Tassin about the terms of her plea deal.
To support his argument that he is entitled to the exclusion of Ms. Tassin’s testimony, defendant cites State v. Lee, 00-2429 (La.App. 4 Cir. 1/4/01), 778 So.2d 656, writ denied, 01-0047 (La.1/8/01), 778 So.2d 1147, and Taylor v. Illinois, 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988). These cases are 13r,clearly distinguishable and do not lend support to defendant’s argument that he is entitled to the exclusion of Ms. Tassin’s testimony.
First, in neither Lee nor Taylor was the evidence at issue introduced at a first trial and then subsequently excluded from a second trial, as defendant seeks here with Ms. Tassin’s testimony. In Lee, the evidence was suppressed in the first trial and then excluded from the second; and in Taylor, there was only one trial from which the evidence was excluded. Second, in both Lee and Taylor, the evidence was excluded as a sanction for willful discovery violations. In the instant case, the federal habeas court’s opinion indicates that its reversal of defendant’s conviction was not based upon a discovery violation. Rather, it was based upon a trial error, specifically, the misleading of the jury.
Based on the foregoing, and in light of the fact that defendant was already granted relief in the form of a new trial for the errors which occurred in his first trial, we find that he was not entitled to the additional relief of excluding Ms. Tassin’s testimony from the second trial. Accordingly, we find that the trial court did not err in denying defendant’s motion to exclude Ms. Tassin’s testimony. This argument is without merit.

CROSS-EXAMINATION OF GEORGINA TASSIN

(Assignment of Error Number 12)

In this assignment of error, defendant argues that his rights to due process, to a fair trial, and to present a defense were violated when the trial court did not allow defense counsel to cross-examine Ms. Tassin with respect to defendant’s habit of taking the fall for his and his wife’s joint criminal conduct in the past.
At trial, during cross-examination of Ms. Tassin, defense counsel asked her if she had ever been in trouble with the law before for drugs. The prosecutor objected to this line of questioning on the basis that evidence of arrests was not Inadmissible for impeachment purposes; rather, only convictions could be used. In response, defense counsel informed the court that she was not using the evidence for impeachment purposes, but wanted to show bias and motive. After considering arguments of counsel, the trial court denied defendant’s request to introduce this evidence, stating as follows:
The Court’s position is, the fact that she was allowed to plead to armed robbery, the fact that she testified against her husband, are all questions that I’m not limiting you in your cross-examination. ... I believe that this evidence, I haven’t seen or been shown at this particular time, that the mere fact that Mr. Tassin may have taken so-called pleas, or may have taken charges to help his wife, it doesn’t show to this Court any bias, at all.
I believe that you have enough evidence to be able to go after this witness, with all of the things that she’s been given by the State, to date. I don’t believe that any arrest, at this point, would (inaudible word — coughing) to these proceedings. I don’t believe that that, in and of itself, is going to be enough for us to hide behind the bias.
Therefore, I’m not going to allow the arrests to be admitted.
*1259 The trial court subsequently allowed defense counsel to proffer this evidence. In a proffer at trial, Ms. Tassin testified that while she and defendant were residing in New York in 1981, they were arrested for attempting to rob a pharmacy. Ms. Tassin testified that she was locked up for a few days, but she does not think that she was convicted as a result of the incident. Defendant, on the other hand, was convicted and was incarcerated for a few months. Ms. Tassin testified that she believed defendant protected her by “taking that conviction.”
Ms. Tassin also testified regarding another incident in which she and defendant were arrested for forging prescriptions, but only defendant was convicted as a result. Ms. Tassin indicated that “maybe” defendant was trying to protect her by taking that conviction.
Defendant now contends that the trial court’s refusal to allow this evidence violated his rights under LSA-C.E. art. 613 to admit evidence of a witness’s bias, 137interest, or corruption. Defendant asserts that this evidence about his “taking the fall” for his and his wife’s joint criminal conduct in the past would have revealed “the power dynamic of a relationship in which [Ms. Tassin] consistently connived to save herself at the expense of her husband, regardless of the truth.” He maintains that this evidence was necessary to counter Ms. Tassin’s testimony at trial that defendant had the power over her, explaining why she initially lied to the police about the armed robbery to protect him, and that defendant tried to pressure Ms. Tassin to lie to save himself. We find no merit to this argument.
Every testifying witness in a criminal case subjects himself to limited examination relative to his criminal convictions. LSA-C.E. art. 609.1(A). Generally, evidence of arrests for which there has not been a conviction is not admissible upon the issue of credibility. LSA-C.Cr.P. art. 609.1(B); State v. Washington, 03-1135 (La.App. 5 Cir 1/27/04), 866 So.2d 973, 979-980. However, evidence of an arrest may be admissible for impeachment purposes when it is independently relevant to show bias. State v. Robinson, 337 So.2d 1168, 1171 (La.1976). The trial court’s determination regarding the relevancy and admissibility of evidence will not be overturned on appeal absent a clear abuse of discretion. State v. Gross, 12-73 (La.App. 5 Cir. 2/21/13), 110 So.3d 1173, 1183, writ denied, 13-661 (La.10/25/13), 124 So.3d 1091.
In the instant case, the trial court determined the mere fact that Mr. Tassin may have taken so-called pleas, or may have taken charges to help his wife does not show bias. We find no abuse of discretion in the trial court’s ruling. The testimony in question does not show bias and does not support defendant’s theory that Ms. Tassin consistently “connived” to save herself at the expense of her husband. Rather, the evidence merely indicates that defendant and Ms. Tassin were arrested together and that only defendant was charged. There are numerous | .^explanations for why one suspect may be prosecuted for a joint crime while the other is not. As the State points out in its brief, the record is silent “as to the strength of the evidence in those two cases vis-a-vis the defendant and Georgina, the decision making process of the prosecutors in each case and the thought process of the defendant to (presumably) plead guilty in those cases.”
Further, as noted by the trial court, defense counsel had sufficient evidence, without considering the prior arrests, to attack Ms. Tassin’s credibility. Ms. Tassin was subject to extensive cross-examination about the circumstances surrounding her *1260 guilty plea to armed robbery. The jury knew of Ms. Tassin’s participation in the crime and was clearly made aware of her bias through her testimony that she pled guilty to a reduced charge in exchange for testimony against her husband, that she hoped that she would receive ten years as a result of that plea, and that she actually received a ten-year term of imprisonment.
Moreover, the introduction of this evidence would have amounted to an impermissible reference to other crimes committed by defendant. LSA-C.E. art. 404(B)(1). For these reasons, we find that the trial court did not abuse its discretion in refusing to admit this evidence. This assignment is without merit.

JURY INSTRUCTION ON ALFORD PLEA

(Assignments of Error Numbers 13 and 14)

In these assignments, defendant argues his rights to due process, to a fair trial, and to present a defense were violated when the trial court denied the defense’s proposed jury instruction regarding a guilty plea pursuant to North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).
In connection with her involvement in the instant offense, Sheila Mills, on May 4, 1987, pled guilty to armed robbery. At that time, Ms. Mills was apparently under the impression that her plea would be made pursuant to North Carolina v. 39Alford, supra, insofar as she would not have to admit her guilt, but rather would plead guilty because it would be in her best interest. However, the trial court refused to accept her plea pursuant to Alford. Consistent with the transcript from her 1987 plea proceedings, Ms. Mills, at the instant trial, denied participating in any armed robbery plan and consistently maintained that she ultimately admitted her guilt so the court would accept her plea.
At the current trial, the State relied on the fact that Ms. Mills had pled guilty to armed robbery to prove that an armed robbery plan existed. In addition, the State extensively cross-examined Ms. Mills about her plea colloquy in an attempt to impeach her trial testimony that there was no robbery plan. The State also argued during trial that Ms. Mills would not have pled guilty to armed robbery if she was, in fact, not guilty. As a result of these arguments by the State, defendant requested that the court instruct the jury on the legal definition of an Alford, plea; however, the trial court denied defendant’s request. Defendant now maintains that as a result of the trial court’s denial of his request, he “was deprived of the force of important evidence that rebutted evidence presented by the State supporting the existence of the armed robbery plan.”
In the instant case, we find that the trial court properly instructed the jury according to law. See LSA-C.Cr.P. arts. 802 and 804. Among other charges, the trial judge instructed the jury regarding the elements of the offense, the duty to follow the law, the presumption of innocence, and their duty to determine the credibility of witnesses. Moreover, even if the trial court erred in not instructing the jury on the legal definition of an Alford, plea, the jury heard Ms. Mills repeatedly explain that she had pled guilty not because she was in fact guilty, but because it was in her best interest to do so. The jury also heard Ms. Mills repeatedly testify that she did not participate in a plan to commit an armed robbery. | ^Consequently, an instruction on an Alford plea would not have further assisted the jury in its assessment of Ms. Mills’ testimony. Accordingly, this argument lacks merit.

*1261
EXPERT OPINION ON DEFENDANT’S GUILT

(Assignments of Error Numbers 15 and 16)

In defendant’s next argument, he asserts that his rights to due process, to a fair trial, and to present a defense were violated when the trial court denied the defense’s objection to strike the State expert’s testimony, which defendant contends was an impermissible expression of opinion as to his guilt. Defendant argues Colonel Timothy Scanlan’s testimony that there was no physical evidence supporting self-defense violated the mandate in LSA-C.E. art. 704 that “an expert witness shall not express an opinion as to the guilt or innocence of the accused.”
Colonel Scanlan, the Crime Lab Director for Jefferson Parish Sheriffs Office, was qualified as an expert in the fields of crime scene reconstruction, firearms and tool marks, and blood stain pattern analysis. During the State’s direct examination of Colonel Scanlan, the prosecutor asked, “Is there any physical evidence that was found in this car that supports a claim of self defense?” Colonel Scanlan responded, “No, sir.” Subsequent to his answer, the prosecutor asked this witness two more questions and then tendered him for cross-examination. The defense then began its cross-examination, which included the following questions relating to self-defense:
[DEFENSE]:
... [Y]ou said that there’s — no physical evidence [that] supports a claim of self defense; I mean, that seems to suggest that you know a lot about what happened in that car?
[COL. SCANLAN]:
No sir, I’m just simply saying there’s no physical evidence that supports a claim of self defense.
|41 [DEFENSE]:
There’s no evidence that’s consistent with self defense?
[COL. SCANLAN]:
No physical evidence that supports that.
The defense then continued with the cross-examination of this witness, participated in several bench conferences during the course of the cross-examination, and proffered additional testimony from Colonel Scanlan on another issue. Following the proffer, defense counsel finally objected to the testimony elicited by the State from Colonel Scanlan that the evidence did not support a claim of self-defense.
Given this belated objection, we find that this issue has not been properly preserved for appellate review. LSA-C.Cr.P. art. 841(A) provides: “An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.” This Court has held that to preserve the right to seek appellate review of an alleged trial court error, a party must state an objection contemporaneously with the occurrence of the alleged error, as well as the grounds for that objection. An objection made after the evidence is before the jury is too late. State v. Smith, 11-638 (La.App. 5 Cir. 3/13/12), 90 So.3d 1114, 1123.
In the instant case, defense counsel’s objection to the question came too late. Pursuant to LSA-C.Cr.P. art. 841(A), defendant is precluded from raising this issue on appeal. We further note that not only did defendant fail to timely object to the prosecutor’s question, but he clearly acquiesced in the testimony’s admission by asking questions relating to self-defense. Accordingly, the issues raised by defendant in this argument present nothing for appellate review.
*1262 | a9DELAY in prosecution

(Assignment of Error Number 17)

In defendant’s seventeenth assignment of error, he argues that the 24-year delay between the incident and the trial caused by the State’s misconduct violated his rights to due process and to present a defense. Defendant alleges his trial was fundamentally unfair based on three factors caused by the delay. First, the victim’s car was destroyed in the intervening years, thereby thwarting the defense’s ability to analyze the crime scene. Second, the scar on defendant’s hand, an integral part of his self-defense claim, became less noticeable over time. Lastly, defendant notes that as a result of the delay in prosecution, several defense witnesses became unavailable.
Due process requires that the State provide a defendant with any exculpatory evidence in its possession that is material to defendant’s guilt or punishment, regardless of the good faith or bad faith of the prosecutor. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1968). When a defendant claims that his due process rights have been violated by the State’s failure to preserve potentially useful evidence, the defendant has the burden of showing that the State acted in bad faith. Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); State v. Horton, 09-250 (La.App. 5 Cir. 10/27/09), 28 So.3d 370, 378. Moreover, the Louisiana Supreme Court has acknowledged that “there simply is no absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution.” State v. Dyer, 12-1166 (La.10/26/12), 101 So.Sd 38, 41.
In the instant case, defendant has not alleged, nor is it evident from the record, that the State acted in bad faith in destroying the victim’s car. In fact, in defendant’s “Motion to Dismiss Prosecution with Prejudice on the Grounds of |4SState Misconduct, Violation of Speedy Trial, and Requirements of Due Process,” filed on November 29, 2010, defendant conceded: “Some of the delay or destruction of evidence was not caused by bad faith, bút still must be charged to the state.” Rather, it would seem the destruction of the car was due to the practical consideration that the State cannot indefinitely store every vehicle seized in connection with a crime. This appears especially pertinent under the facts of this case where defendant had been convicted and the State could not have foreseen that his conviction would be overturned more than two decades later.
Moreover, we note that defendant had access to the photographs of the car and presented expert testimony regarding ballistics evidence inside the car. Accordingly, we find that the destruction of the car did not deprive defendant of his due process rights. See State v. Schexnayder, 96-98 (La.App. 5 Cir. 11/26/96), 685 So.2d 357, 365-366, writ denied, 97-0067 (La.5/16/97), 693 So.2d 796, cert. denied, 522 U.S. 839, 118 S.Ct. 115, 139 L.Ed.2d 67 (1997); and State v. Seals, 09-1089 (La.App. 5 Cir. 12/29/11), 83 So.3d 285, 346, writ denied, 12-0293 (La.10/26/12), 99 So.3d 53, cert. denied, — U.S. -, 133 S.Ct. 2796, 186 L.Ed.2d 863 (2013) (where this Court considered similar claims and found that the defendant failed to show that the State acted in bad faith in failing to preserve the evidence).
Defendant also claims that his rights to a fair trial and to present a defense were violated because the scar on his hand, an integral part of his self-defense claim, became less noticeable over time, and further, several defense witnesses became unavailable.
*1263 Although defendant’s scar had faded over the years, the jury nonetheless heard defendant’s theory that he wedged his hand into the firing mechanism, and the jury also viewed a photograph of his hand purportedly showing the remnants of |44the scar. Moreover, although Sue Born, Marijo Cronkhite, and Linda Torrey Price were unavailable to testify at the second trial, their testimony from the first trial was introduced. Accordingly, we find that defendant was not prejudiced or deprived of his due process rights in regard to this evidence. Accordingly, the arguments raised by defendant in this assigned error lack merit.

DENIAL OF MOTION TO RECUSE

(Assignments of Error Numbers 18 and 19)

Defendant next challenges the trial court’s denial of his motion to recuse the trial judge, the Honorable Donald Rowan.
On July 7, 2008, defendant filed a “Motion to Recuse and for Discovery in Support of Motion,” in which, pursuant to LSA-C.Cr.P. art. 671(A)(3),[4] he argued Judge Rowan should be recused on account of his employment in the district attorney’s office during defendant’s lengthy post-conviction proceedings which raised allegations of prosecutorial misconduct. Defendant specified that his motion was not based on a claim that Judge Rowan was biased or had a personal interest in the case. Defendant also acknowledged that Judge Rowan’s recusal was not required merely because he was employed in the district attorney’s office during defendant’s prosecution. Rather, he sought re-cusal on the grounds of the appearance of partiality. Judge Rowan denied the motion on July 7, 2008.
On July 21, 2008, a recusal hearing was conducted before Judge Molaison who heard testimony from Judge Rowan and assistant district attorney Terry Bou-dreaux. Judge Rowan testified that he had been employed in the Jefferson Parish District Attorney’s Office from March of 1997 until his judicial election in November of 2007. The judge testified that he did not remember performing any duties as a prosecutor in defendant’s case and further that he did not discuss | ^defendant’s case with his colleague Terry Boudreaux. In addition, Terry Boudreaux, who has been employed at the Jefferson Parish District Attorney’s Office since 1988, testified that he did not remember discussing defendant’s case with Judge Rowan.
At the conclusion of the hearing, the court denied the recusal motion, stating in part as follows:
Based upon the testimony that we had today, it is quite apparent to me, as the fact finder, that neither Mr. Boudreaux nor Judge Rowan communicated in any way with regard to your case, Mr. Tas-sin....
Judge Rowan, specifically, has no recollection and has said almost emphatically, that he had no role in the prosecution of your case, had no supervision, there are no facts alleging that, and that he was not associated with the prosecution of your case, quote, in any way.
Defendant now contends that this denial was an abuse of discretion and violated his due process rights to a fair trial by an impartial tribunal, free from the appearance of partiality. This Court has previously addressed this issue and found it to *1264 be without merit. Specifically, defendant filed a supervisory writ application in this Court seeking review of the trial court’s denial of his motion to recuse. On August 12, 2008, this Court denied relief with the following disposition:
Relator seeks recusal of the trial judge based on the “appearance of partiality” due to the trial judge having worked for the district attorney’s office during 10 of the 18 years relator fought for a new trial. At the recusal hearing, the trial judge testified that he did not perform any duties in this case, and was unaware of hearings and rulings during the post-conviction proceedings. The assistant district attorney who handled relator’s post-conviction proceedings testified that he had no independent recollection of having discussed relator’s post-conviction proceedings with the trial judge. Thus, given the guidelines set forth in State v. Connolly, 2006-0540 (La.6/2/06), 930 So.2d 951, we see no error in the denial of relator’s motion for recusal.
State v. Tassin, 08-664 (La.App. 5 Cir. 8/12/08) (unpublished writ disposition).
UfiThe prior denial of supervisory writs does not preclude reconsideration of an issue on appeal, nor does it prevent the appellate court from reaching a different conclusion. State v. Castleberry, 98-1388 (La.4/13/99), 758 So.2d 749, 755, cert. denied, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999). However, under the doctrine of “law of the case,” an appellate court will generally refuse to reconsider its own rulings of law on a subsequent appeal in the same ease. The law of the case doctrine is discretionary. Reconsideration of a prior ruling is warranted when, in light of a subsequent trial record, it is apparent that the determination was patently erroneous and produced unjust results. State v. Pettus, 11-862 (La.App. 5 Cir. 5/22/12), 96 So.3d 1240, 1242-43.
In the present case, defendant does not allege, nor does the record reveal, any new evidence that indicates this Court’s previous ruling was patently erroneous or produced unjust results. Accordingly, this assigned error is without merit.

CUMULATIVE EFFECT OF ERRORS

(Assignment of Error Number 20)

In this assignment of error, defendant argues that the trial court erred in denying his motions to dismiss and for a mistrial which were based on the cumulative effect of the State’s misconduct and the trial court’s erroneous rulings.
The Louisiana Supreme Court has noted that the “cumulative error” doctrine has lost favor in the Louisiana courts. State v. Manning, 03-1982 (La.10/19/04), 885 So.2d 1044, 1110, cert. denied, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005). This Court has held that the combined effect of assignments of error, none of which warrant reversal on its own, does not deprive a defendant of his right to a constitutionally fair trial. State v. Seals, 83 So.3d at 354.
|47In the instant case, we have reviewed defendant’s arguments relating to prosecu-torial misconduct and the trial court’s erroneous rulings and have concluded that defendant is not entitled to reversal on any of the grounds as presented in his assignments of error. Thus, the cumulative effect of these claims does not entitle defendant to relief. Accordingly, this assigned error is without merit.

EXCESSIVE SENTENCE

(Assignments of Error Numbers 21 and 22)

On appeal, defendant also challenges his statutorily mandated sentence *1265 of life imprisonment without benefits as unconstitutionally excessive. Specifically, defendant maintains that his sentence is excessive because he is “exceptional” on account of his troubled history from a young age, his intoxication on narcotics at the time of the crime, his psychiatric maladies, his lack of a violent criminal history, an exemplary prison record in the 24 years since the crime, his ongoing close relationships -with his daughter and other family members, and the fact that he endured 22 years in the oppressive conditions of death row.
We first note that defendant’s life sentence is mandatory under LSA-R.S. 14:30.1(B). It is presumed that a mandatory minimum sentence is constitutional. State v. Royal, 03-439 (La.App. 5 Cir. 9/30/03), 857 So.2d 1167, 1174, writ denied, 03-3172 (La.3/19/04), 869 So.2d 849.
Nevertheless, even though defendant received the mandatory minimum sentence, that sentence may still be reviewed for constitutional excessiveness. State v. Royal, 857 So.2d at 1174. To rebut the presumption that the mandatory minimum is constitutional, the defendant must show that: “[he] is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature’s failure to assign sentences that are meaningfully 14Stailored to the culpability of the offender, the gravity of the offense and the circumstances.” State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672, 676; State v. Royal, 857 So.2d at 1174.
At his sentencing hearing, defendant failed to present any evidence or make any argument regarding a downward departure from the mandatory minimum sentence. Accordingly, defendant has failed to rebut the presumption of constitutionality of the mandatory sentence. Moreover, we note that the record before us supports the sentence imposed. The evidence established that defendant, during an apparent planned armed robbery, shot two victims, killing one, and attempted to evade apprehension by fleeing the scene and destroying evidence. Thus, we find that the trial court was justified in imposing the mandatory life sentence on defendant and that the sentence was not unconstitutionally excessive. The issues raised relating to the excessiveness of sentence are likewise without merit.

DENIAL OF MOTION TO DISMISS

(Pro Se Assignment of Error Number 1)

In defendant’s first pro se assignment of error, he argues that the trial court erred in denying his motion to dismiss for the State’s failure to retry him within 180 days of the federal habeas grant and for the State’s repeated Napue violation at his second trial.
On March 23, 2007, the Eastern District Court of Louisiana granted defendant’s petition for a writ of habeas corpus and vacated his first degree murder conviction. The court ordered “that the writ of habeas corpus will issue unless the State of Louisiana initiates retrial of the petitioner within 180 days after the entry of this order.” Tassin v. Cain, 482 F.Supp.2d 764, 775 (E.D.La.2007).
|490n June 16, 2008, the 24th Louisiana Judicial District Court set defendant’s trial for August 18, 2008. However, it was not until February 5, 2009, that a Jefferson Parish Grand Jury indicted defendant with the second degree murder of Edward Martin in violation of LSA-R.S. 14:30.1.
On November 29, 2010, defendant filed a “Motion to Dismiss Prosecution with Prejudice on the Grounds of State Misconduct, Violation of Speedy Trial, and Requirements of Due Process.” In this motion, defendant argued that the State’s failure *1266 to bring him to trial within 180 days of the order granting habeas relief entitled him to a dismissal of the charge. On November 30, 2010, the trial court denied this motion and trial commenced. Clearly, defendant was not brought to trial within 180 days of the order granting him habeas relief. Nonetheless, defendant is not entitled to the relief he now seeks.
The writ of habeas corpus is an “attack by a person in custody upon the legality of that custody.” The traditional function of the writ is to secure release from illegal custody. Preiser v. Rodriguez, 411 U.S. 475, 484, 93- S.Ct. 1827, 1833, 36 L.Ed.2d 439 (1973). Federal courts are authorized, under 28 U.S.C. § 2243, to dispose of habeas corpus matters “as law and justice require.” In construing § 2243 and its predecessors, the United States Supreme Court has repeatedly stated that federal courts may delay the release of a successful habeas petitioner in order to provide the State an opportunity to correct the constitutional violation found by the court. Thus, a court has broad discretion in conditioning a judgment granting habeas relief. Hilton v. Braunskill, 481 U.S. 770, 775, 107 S.Ct. 2113, 2118, 95 L.Ed.2d 724 (1987).
The United States Fifth Circuit Court of Appeals has recognized that in rare circumstances a habeas court can end a state criminal proceeding as part of the habeas remedy. Jones v. Cain, 600 F.3d 527, 542 (5th Cir.2010). For a federal Isncourt to exercise its habeas corpus power to stop a state criminal proceeding, “special circumstances” must exist. The constitutional violation must be such that it cannot be remedied by another trial, or other exceptional circumstances exist such that the holding of a new trial would be unjust. Capps v. Sullivan, 13 F.3d 350, 352-53 (10th Cir.1993); Jones v. Cain, 600 F.3d at 542 (5th Cir.2010). See also Foster v. Lockhart, 9 F.3d 722, 727 (8th Cir.1993).
In the instant case, defendant contends he is entitled to the dismissal of his prosecution and a ban on retrial due to the “exceptional circumstances” that he has spent 22 years incarcerated on death row and that his ability to present a defense has been hampered due to the passage of 24 years since the crime. Further, defendant contends that the State’s persistent misconduct and continued efforts to deceive the jury about the credibility of its key witness, Georgina Tassin, constitute exceptional circumstances that rendered the trial fundamentally unfair, and therefore, this Court should order that defendant be released.
In the present case, there has been no showing of “exceptional circumstances” so as to warrant the dismissal of the prosecution or the release of defendant. There was overwhelming evidence of defendant’s guilt. All the eyewitnesses to the crime were available and did testify at defendant’s second trial. Moreover, while some of the defense witnesses were unavailable for defendant’s second trial, none were eyewitnesses to the crime, and their exculpatory testimony, albeit via transcript, was introduced. In addition, defendant’s conviction was reversed based on the misleading nature of Ms. Tassin’s testimony and the State’s failure to correct it. This error was corrected on retrial. Indeed, the jury was informed that Ms. Tassin received a reduced charge in exchange for her testimony, that she had testified with the hope of receiving a ten-year sentence, and that she did receive that sentence.
|,MThus, even though defendant was not retried within 180 days of the federal court order granting habeas relief, defendant has not shown he is exceptional such that a dismissal of his prosecution and a bar against his retrial are warranted. Accord *1267 ingly, we find, no error in the trial court’s denial of defendant’s motion to dismiss prosecution.

EXCLUSION OF HOSPITAL RECORDS

(Pro Se Assignment of Error Number 2)

In defendant’s second pro se assignment of error, he argues that the trial court erred in excluding the hospital records of Mr. Stagner. These records, defendant contends, indicated that Mr. Stagner sustained his injuries in an “altercation,” and therefore supports his theory of self-defense.
During the defense’s cross-examination of Mr. Stagner, defense counsel sought to introduce certified copies of Mr. Stagner’s medical records from West Jefferson Hospital. Alleging that the records contained an initial statement by Mr. Stagner to his treating physician, the defense sought to introduce them as prima facie proof of their contents pursuant to LSA-R.S. 13:3714 and as falling under the hearsay exception provided in LSA-C.E. art. 803(4). In particular, defense counsel sought to introduce a statement in the records, allegedly made by the physician, that Mr. Stagner had been in an “altercation.”
The court found the records to be inadmissible, ruling as follows:
... [Although [LSA-R.S. 13:3714] provides an exception to the hearsay rule with respect to those who made the medical records, i.e., physicians, nurses, technicians, it does not allow instances in which ... ‘The statement sought to be admitted is not the statement of a person who made the record, but a statement of an unknown declarant to a record maker’.
I have no way of knowing or deciphering from this particular exhibit, who made this statement as to how, because it doesn’t indicate — the doctor doesn’t indicate that the patient relayed this information to them; so, therefore based on that, although the documents itself may come in to the record, I don’t believe that it | ^passes the hearsay muster needed to be able to be presented to the Jury.
So my ruling is, is that I’m not going to allow this to be admitted to the Jury, based on it being hearsay.
Defendant now challenges the trial court’s ruling that Mr. Stagner’s West Jefferson medical records were not admissible. For the reasons that follow, we find no error in the trial court’s ruling.
LSA-R.S. 13:3714(A) provides:
Whenever a certified copy of the chart or record of any hospital, signed by the administrator or the medical records librarian of the hospital in question, or a copy of a bill for services rendered, medical narrative, chart, or record of any other state health care provider, as defined by R.S. 40:1299.39(A)(1) and any other health care provider as defined in R.S. 40:1299.41(A), certified or attested to by the state health care provider or the private health care provider, is offered in evidence in any court of competent jurisdiction, it shall be received in evidence by such court as prima facie proof of its contents, provided that the party against whom the bills, medical narrative, chart, or record is sought to be used may summon and examine those making the original of the bills, medical narrative, chart, or record as witnesses under cross-examination.
The Louisiana Supreme Court, recognizing this statute as an exception to the hearsay rule, has held that “it must be strictly construed, and all formalities prescribed in the law must be followed.” *1268 State v. Juniors, 03-2425 (La.6/29/05), 915 So.2d 291, 324, cert. denied, 547 U.S. 1115, 126 S.Ct. 1940, 164 L.Ed.2d 669 (2006). In Juniors, the defendant, who was convicted of first degree murder, sought to introduce the medical records of a victim, which noted that the patient was a 46-year old male who was shot by a disgruntled employee. The State objected on grounds that the doctor who prepared the report had died, and thus, was unavailable for cross-examination. The defense did not refute this assertion. The trial court ruled the medical records admissible, but ordered that the phrase “by a disgruntled employee” be excised from the report as hearsay. The defendant argued on appeal that the trial court erred in ruling this statement inadmissible.
IsaThe Louisiana Supreme Court affirmed the ruling of the trial court, stating, in part, as follows:
... [Bjecause the physician who prepared the statement could not be summoned by the State for cross-examination, an essential prerequisite for admissibility of the medical report could not be established. On this basis alone, the records did not qualify for introduction under the hospital records exception to the hearsay rule. Further, even assuming the records could have been admitted into evidence, we have recognized that LSA-R.S. 13:3714 provides an exception to the hearsay rule with respect to those who made the medical record, i.e., physicians, nurses, and technicians. In this case, the statement sought to be admitted is not the statement of a person who made the record, but the statement of an unknown declarant to the record maker. It is double hearsay. As such, the statement falls outside the ambit of the intended scope of the medical records exception (which must be strictly construed) and was properly excised by the trial court.
State v. Juniors, 915 So.2d at 324-25 (citations omitted).
Similarly, in the instant case, where the statement was of an unknown declarant and the maker of the record was not subject to cross-examination, the record did not qualify for introduction under the hospital records exception to the hearsay rule. Consequently, we find that the trial court did not abuse its discretion in refusing to admit this record into evidence. This assigned error is without merit.

VALIDITY OF GUILTY VERDICT

(Pro Se Assignment of Error Number 3)

In defendant’s third pro se assignment of error, he argues that because the jury’s guilty verdict did not establish under which theory of second degree murder defendant was convicted, the verdict is invalid.
On January 4, 2010, the defense filed a “Motion to Quash the Indictment for Failure to Provide Notice of the Nature of the Charges, or, in the Alternative, Renewed Motion for Bill of Particulars.” In this motion, the defense argued that the State’s failure to specify under which theory of second degree murder defendant was being prosecuted required that the indictment be quashed. The trial | S4court denied the motion. Defendant then renewed this argument in a subsequent motion filed on November 22, 2010, which the trial court again denied.
This Court recently addressed this issue in State v. Seals, 83 So.3d at 346. In that case, the defendant was convicted of second degree murder, and the trial judge had instructed the jury on both theories of second degree murder. However, the jury was not polled regarding upon which theory the conviction was based.
*1269 On appeal, the defendant argued that the trial judge erred by refusing to instruct the jury that it must be unanimous as to which theory of second degree murder it applied to convict (i.e., intentional murder, or causing death during an enumerated felony, and if so, which felony) and the factual predicate for the verdict. This Court denied relief, holding that a jury is not constitutionally required to agree on a single theory to convict a defendant where it is instructed as to alternative theories. State v. Seals, 83 So.3d at 346.
In the present case, the jury was instructed on both theories of second degree murder. Consequently, this argument is without merit.
Under this assignment of error, defendant also raises an argument that the exclusion of non-pardoned felons from the grand and petite juries violates both the federal and state constitutions. He contends that LSA-C.Cr.P. art. 401(A)(5), the article that disqualifies such persons from jury service, is unconstitutional. This article provides that in order to qualify as a juror, a person must “not be under indictment for a felony nor have been convicted of a felony for which he has not been pardoned by the governor.” Because this article was employed in defendant’s case, he contends his conviction must be reversed.
In State v. Jacobs, 04-1219 (LaApp. 5 Cir. 5/31/05), 904 So.2d 82, writ denied, 05-2072 (La.4/28/06), 927 So.2d 282, this Court addressed the same argument and noted that restoration of full rights of citizenship upon release from | .^federal or state supervision under Article I, § 20 does not restore a convict’s right to sit on a jury. Only basic rights such as the right to vote, work, or hold public office are restored. State v. Jacobs, 904 So.2d at 91.
Article V, § 33(A) of the Louisiana Constitution provides: “A citizen of the state who has reached the age of majority is eligible to serve as a juror within the parish in which he is domiciled. The legislature may provide additional qualifications.” This Court found the legislature was well within its constitutional authority in instituting the qualifications in LSA-C.Cr.P. art. 401. State v. Jacobs 904 So.2d at 91.
Accordingly, the arguments raised by defendant in this assigned error are likewise without merit.

REASONABLE DOUBT JURY INSTRUCTION

(Pro Se Assignment of Error Number 4)

In defendant’s fourth pro se assignment of error, he argues that the trial court’s instruction on reasonable doubt im-permissibly reduced the State’s burden of proof, rendering his trial fundamentally unfair.
The jury received the following reasonable doubt instruction:
While the State must prove guilt beyond a reasonable doubt, it does not have to prove guilt beyond all possible doubt. Reasonable doubt is doubt based on reason and common sense and is present when, after you have carefully considered all the evidence, you cannot say that you are firmly convinced of the truth of the charge.
Defense counsel objected to this version, which the trial court denied with the following: “I’ll note your objection. It’s the standard reasonable doubt charge that’s given in every case and that’s the one I’m going to give.”
We find no merit to defendant’s argument. Indeed, this Court has found that a verbatim reasonable doubt instruction passed constitutional muster. See State v. Seals, 83 So.3d at 342. Likewise, we find *1270 that the instruction in the present case is Isfifree from constitutional defect, and therefore, the trial court did not err in giving this reasonable doubt instruction. This assignment of error is likewise without merit.

STATE’S SELECTIVE EXERCISE OF IMMUNITY POWER

(Pro Se Assignment of Error Number 5)

In defendant’s final pro se assignment of error, he argues that his rights to due process and a fair trial were violated by the State’s selective exercise of its immunity power. In particular, defendant complains about the State’s decision to immunize Darryl Macaluso, who testified favorably for the State, but not Mary Ann Valverde, who defendant contends would have testified favorably for the defense. Defendant claims that this inequitable immunization distorted the court’s fact-finding process and resulted in an unfair trial, requiring a new trial.
On December 6, 2010, the State moved to compel the testimony of Mr. Macaluso pursuant to LSA-C.Cr.P. art. 439.1. Defense counsel objected to the State’s offer of immunity to Mr. Macaluso, but not to Ms. Valverde. The State explained its decision:
With respect to Mr. Macaluso, the State does not believe that he could validly exercise a Fifth Amendment Right; however, he, through counsel, advised that despite the passage of time, he believed he had such a Fifth Amendment Right.
Given the delays that we have already experienced in this case, and our desire to bring the case forward as expeditiously as possible, we have elected, as is our discretion, to file the motion to compel [Mr. Macaluso’s] testimony conferring use and derivative use immunity.
[[Image here]]
With respect to Ms. Valverde, since it’s been raised, we can address it now. When she is called, it is my understanding, based on a conversation several weeks ago with her attorney, that she anticipates that she will invoke a Fifth Amendment Right.... And a noteworthy difference between the two, Ms. Valverde has testified, in this matter, on post-conviction relief in 1992. She’s already testified regarding the subject matter of this case.... You can’t now hide behind an improperly claimed Fifth Amendment Right to say you shouldn’t testify regarding the same subject matter later on.
157The trial court granted the State’s motion to compel. Subsequently, at the time the defense wished to call Ms. Valverde to the stand, counsel who represented her informed the court that he would advise Ms. Valverde to invoke her Fifth Amendment right not to testify on the ground that she may be exposed to a charge of perjury if her testimony differed from her 1992 testimony. The State responded, “We have reason to believe that Mary Ann Valverde rented that weapon to Mr. Tas-sin, knowing full well that the victims were out in the parking lot. If that’s the case, she’s a principal to first degree murder. So she is very much in jeopardy of prosecution.” The trial court then declared this witness unavailable based on the fact that she would invoke her Fifth Amendment right if called to testify. Consequently, a transcript of Ms. Valverde’s testimony from a 1992 post-conviction proceeding was introduced into evidence.
Defense witness immunity has never been recognized in Louisiana. State v. Lombard, 486 So.2d 106, 108 (La.1986). In State v. Mattheson, 407 So.2d 1150, 1160-61 (La.1981), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983), the Louisiana Supreme Court re- *1271 jeeted a claim for judicial use immunity for a defense witness, stating as follows:
There is no statutory authority for a Louisiana court to grant a defense witness use immunity absent a request from the attorney general together with the district attorney for the district in which the proceeding is or may be held. La.Code Crim.P. art. 439.1. Therefore, any judicially-fashioned immunity must arise from the constitutional guarantees of compulsory process or due process.
Claims for defense witness use immunity have been uniformly rejected by almost all of the federal circuit courts of appeals that have considered the matter. United States v. Turkish, 623 F.2d 769 (2d Cir.1980), cert. denied, 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800, and cases cited therein.
We do not consider that the sixth amendment supports a claim for defense witness immunity. Traditionally, the sixth amendment’s compulsory process clause gives defendant the right to bring his witness to court and have the witness’ non-privileged testimony heard, | ssbut does not carry with it the traditional right to displace a proper claim of privilege, including the privilege against self-incrimination. United States v. Turkish, supra; United States v. Lenz, 616 F.2d 960 (6th Cir.1980), cert. denied, 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124. Nor has section 16 of article 1 of the Louisiana Constitution of 1974 been construed to grant such a right.
Additionally, we do not consider that the due process clause requires that defense witness immunity must be ordered whenever it seems fair to grant it. The essential fairness required by the fifth amendment guards the defendant against overreaching by the prosecutor and insulates him against prejudice. It does not create general obligations for prosecutors or courts to obtain evidence protected by lawful privileges. United States v. Turkish, supra, (footnotes omitted)
In State v. Mattheson, 407 So.2d at 1161, the Louisiana Supreme Court also made clear that “a trial judge properly rejects a claim for defense witness immunity whenever the witness for whom immunity is sought is an actual or potential target of prosecution.” See also State v. Thomas, 504 So.2d 907, 913 (La.App. 1 Cir.1987), writ denied, 507 So.2d 225 (La.1987).
In the present case, defendant suggests prosecutorial misconduct in the State’s selective use of immunity. Defendant contends that the State not only refused to offer this witness immunity, but also actively obstructed his opportunity to present critical defense evidence by explicitly threatening to prosecute her if her testimony presented the opportunity. Defendant asserts that in certain cases involving prosecutorial misconduct or abuse, the due process clause demands defense witness immunity. Defendant is correct in this assertion. See United States v. Morrison, 535 F.2d 223 (3d Cir.1976). However, defendant does acknowledge in his pro se brief that, although the Louisiana Supreme Court has discussed the possibility of pros-ecutorial misconduct creating a due process right to defense witness immunity, it has not decided the issue.
In State v. Lombard, 486 So.2d at 109, the defendant argued that a court may grant defense witness immunity where there has been prosecutorial misconduct or 1 sflwhere the witness is not truly a potential defendant. The Louisiana Supreme Court found it unnecessary to rule on the correctness of the defendant’s interpretation of defense witness immunity because the potential witness was clearly a potential defendant, and the record contained no evidence of misconduct by the prosecutor.
*1272 Likewise, in the instant case, the State asserted that this potential defense witness “rented” the gun that was used in the killing to defendant, clearly making this witness a potential target of prosecution. Moreover, the record contained no evidence of misconduct by the prosecutor in failing to offer this witness immunity. See State v. M.M., 00-1296 (La.App. 3 Cir. 8/29/01), 802 So.2d 43, 65-66, writ denied, 01-3370 (La.10/4/02), 826 So.2d 1121. Moreover, while the prosecution’s refusal to offer immunity to Ms. Valverde may have deterred her from testifying, the defense was not prevented from introducing her exculpatory testimony and in fact introduced her prior testimony via transcript.
Accordingly, we find no error in the State’s refusal to offer Ms. Valverde immunity. This assigned error is without merit.

ERRORS PATENT REVIEW

We have also reviewed the record for errors patent in accordance with LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). Our review reveals no errors that require corrective action.
Having thoroughly reviewed the record of these proceedings, we find that the arguments raised by defendant, in both his counseled and pro se briefs, are without merit. Accordingly, we affirm defendant’s conviction and sentence.

AFFIRMED.

. At the time of defendant's second trial, Georgina Tassin had remarried and was known as Georgina Santiago. This opinion will refer to her as Ms. Tassin.

. Pursuant to a stipulation that Mary Ann Valverde was declared unavailable, the defense presented to the jury testimony offered by Ms. Valverde at a previous proceeding.

. Mr. Martin's body was discovered lying partially face down in a drainage ditch. His pants were pulled down, and one of his front pockets was inverted, indicating that it had been reached into. At trial, Dr. Alvaro Hunt testified that he performed the autopsy on the victim on November 6, 1986, and determined that the cause of Mr. Martin’s death was two gunshot wounds to the back of his neck. He further testified that the victim sustained a superficial gunshot wound to his right upper shoulder and extensive laceration to his right lower cheek.

. LSA-C.Cr.P. art. 671(A)(3) provides that a judge shall be recused when he "has been employed or consulted as an attorney in the cause, or has been associated with an attorney during the latter’s employment in the cause.”