HANS J. LILJEBERG, Judge.
_JjOn January 27, 2011, the Jefferson Parish District Attorney filed a bill of information charging defendant, Michael D. Ball, with first degree robbery, in violation of La. R.S. 14:64.1. Defendant pleaded not guilty and proceeded to a jury trial on September 7, 2011. On September 8, *898 2011, a 12-person jury found defendant guilty as charged. On September 15, 2011, the trial court denied defendant’s Motion in Arrest of Judgment and Alternatively Motion for New Trial. Additionally on that date, the trial court sentenced defendant to 30 years imprisonment at hard labor without benefit of probation, parole, or suspension of sentence with credit for time served.
The State filed a multiple offender bill of information alleging defendant to be a sixth felony offender. On March 8, 2012, the State withdrew the original multiple bill and re-filed a second multiple bill alleging defendant to be a second felony offender. On that date, defendant stipulated to the multiple bill. The trial court then vacated defendant’s original sentence and re-sentenced defendant to 40 | «years imprisonment at hard labor without benefit of probation or suspension of sentence with credit for time served. On March 13, 2012, the trial court granted defendant’s timely motion for appeal.

FACTS

Sergeant Charles Errico of the Harahan Police Department was working the night shift on January 7, 2011, when he responded to a Jefferson Parish Sheriffs Office call at about 2:00 a.m. about a subject in a white Chevy pickup truck stealing wooden pallets at Quikrete of New Orleans in Har-ahan, Louisiana. Sergeant Errico was behind Harahan lockup when he got the call, so he proceeded to the Quikrete location to assist Jefferson Parish deputies. Sergeant Errico was headed east on Jefferson Highway at the intersection with Hord Street when he saw a white pickup truck, matching the vehicle description given, turn right from Hord Street onto Jefferson Highway. Sergeant Errico turned and followed behind the truck as it turned onto Hickory Avenue. As the truck began to travel at a high rate of speed, Sergeant Errico put on his lights and siren and gave chase until the truck turned left into a parking lot at the end of Hickory Avenue and came to a stop. The driver jumped out of the truck and fled on foot. Jefferson Parish Sheriffs deputies arrived and one deputy pursued the suspect on foot.
Sergeant Errico had indicated via radio that a vehicle matching the description of the suspect’s was at Jefferson Highway and Hord Street. Jefferson Parish Sheriffs Office Deputy Micah Blange responded to the call and advised that he was en route. Upon approaching the intersection of Second Street and Hickory Avenue, he observed a white pickup truck traveling at a high rate of speed followed by Sergeant Errico. Deputy Blange joined the chase until the vehicle made an abrupt turn into a parking lot at the end of Hickory Avenue. The suspect |4got out of the truck and fled on foot. Deputy Blange exited his vehicle and chased the suspect, giving loud verbal commands to stop.
Deputy Blange was within ten feet of the suspect when he saw something black in the suspect’s hand. The deputy pulled his pistol and pointed it at the suspect, ordering him to stop and put his hands in the air. The suspect turned and faced him, enabling Deputy Blange to see that the suspect actually had a blue bag in his hand. Deputy Blange holstered his pistol and drew his taser, telling the suspect to stop. When Deputy Blange holstered his gun, the suspect took off again.
Deputy Daniel Lincoln of the Jefferson Parish Sheriffs Office approached from the other side and deployed his taser, causing the suspect to fall. The suspect continued to try to get up. Another deputy arrived and together, they rolled him onto his stomach, and handcuffed him. Deputy Blange read the suspect his rights, which the suspect indicated he understood. Deputy Blange asked the suspect “what *899 are you on?,” and the suspect responded saying “the stupid things that drugs make you do.” Several moments later, Deputy Blange was advised via radio that an armed robbery had occurred at Mr. Binky’s, with the vehicle involved matching the description of the suspect’s vehicle and the perpetrator’s clothing matching those of the suspect. Two witnesses were brought to the scene and both identified the suspect as the perpetrator of the armed robbery.
Deputy Blange returned to the white truck and conducted a search of the vehicle. He found a red bandana on the driver’s side floor board and a pair of black sunglasses on the passenger side floorboard. After the suspect was apprehended, it was discovered he was in possession of a blue Capital One Bank money bag. The money bag contained approximately $210 cash. At trial, Deputy Blange identified the defendant in court as the person that he chased both in the truck and on foot, and ultimately apprehended.
IsMichael Doherty testified that he was at Mr. Binky’s in the early morning hours of January 7, 2011, between 12:00 a.m. and 2:00 a.m. Mr. Doherty testified that he went to Mr. Binky’s, talked to the clerk, Jennifer Rohrbacker, and then both went outside for a cigarette. While outside the store, a man approached them and told him to get on the ground. The man ran inside the store and asked for money. He came back out a minute later. Mr. Doherty testified that he and the clerk were directly outside the door and were only there a couple of minutes before the man approached them.
Mr. Doherty testified that the man was running when he approached them and was wearing a jumpsuit and hoodie, with his face covered from the nose down with a red bandana and sunglasses. The man’s hand was also covered with a bandana, which was either orange or red. Mr. Do-herty testified that he was unsure of what the man had in his hand. He described the man as a white male and further described the jumpsuit as gray or green, with no sleeves, like a mechanics jumpsuit, with a white or gray hoodie underneath. After Mr. Doherty got onto the ground in a squatting position, the man demanded money and asked the clerk, “Where do I go?” and then ran inside. The clerk followed him into the store. The man came out of the store and told them to stay on the ground before running back in the direction he came from. Mr. Doherty testified that he heard footsteps and eventually heard a car door shut, the vehicle start and speed off. Mr. Doherty testified that he was able to see a white vehicle that was either a car or a low lying truck. Mr. Doherty testified that the clerk called 911. The police later took Mr. Doherty to the suspect, who he positively identified based on the clothing he was wearing.
Jennifer Rohrbacker was the sole clerk on duty at Mr. Binky’s Adult Superstore at the time of the robbery. Around 2:00 a.m., she was assisting a | ^customer and spoke with that customer for about 30 minutes. She testified that upon completing a transaction with the customer, they both went outside to smoke a cigarette, leaving no one else inside the store. Ms. Rohrbacker testified that she is allowed to smoke only when no one is in the store. She and the customer were outside “chitchatting” and having a cigarette when she heard footsteps running and getting closer. She then saw a man running towards her. Ms. Rohrbacker described the man as tall, wearing a light green or gray jumpsuit. He was holding something towards her face and she thought it was a gun. The man had his face covered with a handkerchief and he said something about wanting money. She allowed him into the store *900 because she was scared and did not know what else to do.
Ms. Rohrbacker testified that she turned around and watched him walk behind the counter and told him where the money was. She testified that he was not asking where the money was, but she told him because she was scared and wanted him to leave. The man grabbed an old Capital One money bag from behind the counter and left. Ms. Rohrbacker testified there was $210 in the bag. She explained that the store keeps spare change in the bag for customers who need it for the drink machine or back booth area. After the man left, she called 911 and the police arrived within minutes.
Ms. Rohrbacker was taken with the customer to an area nearby, where she identified the man who robbed her. She returned to Mr. Binky’s and was shown a wallet containing the driver’s license of the suspect. She recognized his face as a regular customer of the store who she saw once every couple of months. Ms. Rohrb-acker testified that the man would browse sale movies in the section right across from the counter, ask for change, then go to the back of the store. She |7would make change out of the cash bag. Ms. Rohrbacker also testified that the store had video surveillance inside and outside.
Ms. Rohrbacker identified the defendant in court as the man who robbed her. She testified that defendant had not been at Mr. Binky’s earlier that night, that she did not have a conversation with him, and that they did not “hatch up” a plan to have him come in and take the money. She testified that she thought he might shoot and kill her, but admitted that she went back in the store towards him and held the door for him when he left the store. Ms. Rohrbacker testified that she kept her eyes on the robber and watched his every move the whole time in case she was asked questions.

ASSIGNMENT OF ERROR

In his sole assignment of error, defendant asserts the trial court erroneously denied his requested special jury instruction on the law of conspiracy. Specifically, the defendant asserts that the trial court’s denial of the instruction deprived him of his right to present a defense, namely that the defendant and clerk conspired together to rob the store, thereby committing a mere theft rather than a robbery.

DISCUSSION

Both the Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee a criminal defendant the right to present a defense. State v. Decay, 07-966 (La.App. 5 Cir. 6/19/08), 989 So.2d 132, 144, writ denied, 08-1634 (La.4/13/09), 5 So.3d 161.
Moreover, La.C.Cr.P. art. 802 mandates that the trial court instruct the jury on the law applicable to each case. State v. Batiste, 06-824, p. 14 (La.App. 5 Cir. 3/13/07), 956 So.2d 626, 636, writ denied, 07-0892 (La.1/25/08), 973 So.2d 751. The trial court is required to charge the jury on the law applicable to any theory of | Sdefense, when properly requested, which the jurors could reasonably infer from the evidence. Id. Under La C.Cr.P. art. 807, a requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly pertinent and correct. Id. The evidence presented at trial must support the requested special charge. Id. Failure to give a requested jury instruction constitutes reversible error only when there is a miscarriage of justice, prejudice to the substantial rights of the accused, or a substantial violation of a constitutional or statutory right. State v. Lawson, 08-123, p. *901 15 (La.App. 5 Cir. 11/12/08), 1 So.3d 516, 527.
Prior to closing arguments, the defense attorney orally requested, off the record, a jury charge as it relates to conspiracy. It is preliminarily noted that defendant did not present a written request for a special jury charge, nor did he serve the State with a copy of such proposed instruction, as required by the first paragraph of La.C.Cr.P. art. 807.[1] The trial transcript reflects that the trial judge and both counsel for the State and defendant participated in a “charge conference” off the record, after which defense counsel, on the record, requested a jury charge related to conspiracy, but added that the trial court had already indicated it would not include the charge. Defense counsel objected for the record and the trial court noted the objection. As defense counsel’s request was not made in writing as required by Article 807, the trial court was not required to grant the defendant’s requested instruction. State v. Netter, 11-202, 11-203 (La.App. 5 Cir. 11/29/11), 79 So.3d 478, 483; State v. Lawson, 08-123 (La.App. 5 Cir. 11/12/08), 1 So.3d 516, 527.
[ ciMoreover, even assuming that defense counsel had properly requested the special jury instruction in writing, the record reflects that the trial court properly denied the request for a conspiracy instruction. Defendant relies on Ms. Rohrb-acker’s testimony that she told him where the money was located and opened the door to allow the intruder to exit the store, rather than running away from the business, as evidence of his and her plan to rob the store. Thus, defendant argues that “some” evidence existed to support an instruction of the law of criminal conspiracy. La.C.Cr.P. art. 802 requires the trial court to charge the jury as to the law applicable to the case. This provision has been interpreted to include any instruction as to the law applicable to any theory of defense which a jury could reasonably infer from the evidence. State v. Mead, 377 So.2d 79 (La.1979), citing State v. Marse, 365 So.2d 1319 (La.1978). A defense of conspiracy based upon the above testimony alone, without more, cannot be reasonably inferred from the evidence. Ms. Rohrbacker explained her actions, testifying that she only told defendant where the money was located because she was scared and wanted him to leave. Ms. Rohrbacker stated that she knew defendant as a customer at Mr. Bulky's, but that he was not at the store on the day of the robbery. She further maintained that she did not have a conversation with defendant and did not “hatch up” a plan to have him come in and take the money.
Additionally, Article 807 requires that a requested special charge be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly pertinent and correct. We find that a charge on criminal conspiracy in the instant case would require explanation to the jury. This extraneous qualification is expressly prohibited by La.C.Cr.P. art. 807.
Furthermore, defense counsel was allowed to fully argue to the jury in closing argument his theory of an “inside job.” Because he was able to present his Imtheory of conspiracy to the jury, defendant has failed to show that he was preju *902 diced by the trial court’s failure to give the requested special jury charge.
Based on the foregoing, we find that the trial judge’s denial of defendant’s request for special jury instruction was proper and did not violate defendant’s right to present a defense.

ERRORS PATENT

The record was reviewed for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The record reflects that defendant’s enhanced sentence was illegally lenient as the trial court failed to order his sentence to be served without benefit of parole. La. R.S. 15:529.1(G) requires that all habitual offender sentences be served without the benefit of probation or suspension of sentence. Further, any habitual offender sentence imposed under La. R.S. 15:529.1 following the offender’s conviction for first degree robbery must carry the parole disability provided by La. R.S. 14:64.1. State v. Bruins, 407 So.2d 685 (La.1981). Nevertheless, this error does not require corrective action because under La. R.S. 15:301.1, the “without benefits” provision is self-activating. State v. McKenzie, 09-893, p. 13 (La.App. 5 Cir. 2/15/11), 61 So.3d 54, 61.

DECREE

Accordingly, defendant’s conviction and sentence are affirmed.

AFFIRMED.

. La.C.Cr.P. art. 807 provides:
The state and the defendant shall have the right before argument to submit to the court special written charges for the jury. Such charges may be received by the court in its discretion after argument has begun. The party submitting the charges shall furnish a copy of the charges to the other party when the charges are submitted to the court.