| STATE OF LOUISIANA | NO. 24-KA-153 |
| VERSUS | FIFTH CIRCUIT |
| CORNELL CAMBRICE | COURT OF APPEAL |
| | STATE OF LOUISIANA |

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 20-3897, DIVISION "I"
HONORABLE NANCY A. MILLER, JUDGE PRESIDING

December 18, 2024

**SUSAN M. CHEHARDY**
**CHIEF JUDGE**

Panel composed of Judges Susan M. Chehardy,
John J. Molaison, Jr., and Scott U. Schlegel

**CONVICTION AFFIRMED**
    **SMC**
    **JJM**
    **SUS**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Morgan Naquin
Deputy, Clerk of Court

COUNSEL FOR DEFENDANT/APPELLANT,
CORNELL CAMBRICE
    Katherine M. Franks

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
    Honorable Paul D. Connick, Jr.
    Thomas J. Butler
    Darren A. Allemand
    Lindsay L. Truhe

**CHEHARDY, C.J.**

Appellant, Cornell Cambrice, appeals his conviction for possession of a firearm by a convicted felon based on the district court's denial of his request to charge the jury on the defense of justification. For the following reasons, we affirm Cambrice's conviction.

**PROCEDURAL HISTORY**

Defendant, Cornell Cambrice, was charged by bill of information on September 21, 2020, with domestic abuse aggravated assault, a violation of La. R.S. 14:37.7 (count 1), and with possession of a firearm by a convicted felon, a violation of La. R.S. 14:95.1 (count 2). Cambrice pled not guilty.

The matter proceeded to trial on September 13, 2022. Prior to the selection of a jury, the State amended the bill of information regarding the prior conviction used in count 2.[1] On September 15, 2022, a twelve-person jury found Cambrice guilty as charged as to count 2, possession of a firearm by a convicted felon, but were unable to reach a verdict on the domestic aggravated assault charge, resulting in a mistrial as to count one.

On September 23, 2022, Cambrice filed a motion for new trial and a motion for appeal, alleging the district court erred in denying his request that the jury be charged with instructions on self-defense and justification. That same day, the motion for new trial was denied. After the defense waived sentencing delays, the district court sentenced Cambrice on count 2 to seventeen years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, to run concurrently with the sentence issued in case number 20-4066. Following sentencing, the district court granted Cambrice's notice of appeal. Also On

---

[1]     In the original bill of information, relative to count 2, the State alleged that Cambrice violated La. R.S. 14:95.1 in that he had in his possession a firearm, having previously been convicted of possession with intent to distribute cocaine, a violation of La. R.S. 40:967(A). On the morning of trial, the State amended the bill as to count 2, alleging Cambrice was previously convicted of distribution of cocaine, not with possession with intent to distribute cocaine.

September 23, 2022, the State filed a multiple offender bill of information as to count 2, and on January 12, 2023, Cambrice stipulated to being a second felony offender. After vacating his original sentence on count 2, the district court resentenced Cambrice as a second felony offender to twenty-five years imprisonment without the benefit of parole, probation, or suspension of sentence. The district court ordered that all aspects of the sentence were to remain the same from Cambrice's prior sentencing. The State then dismissed count 1, the domestic abuse aggravated assault charge.[2]

The instant appeal followed.

**FACTUAL BACKGROUND**

The State called the following witnesses to testify at trial.

*Lisa Jackson[3]*

Lisa Jackson testified that on July 24, 2020, she was living with her mother and her husband, Cornell Cambrice, at 1717 Appleby Lane in Harvey, Louisiana. After leaving work early that day due to inclement weather, she returned home and received a phone call from Cambrice, asking her to pick him up from work at Coleman's Motor Company on Airline Highway. After picking him up, Cambrice told Jackson that he lost his ID card, so she drove him to a "title place" on Lapalco Boulevard to get a replacement, during which the couple got into an argument. According to Jackson, after Cambrice attempted to grab her phone, she pushed him away, and he snatched the keys from the ignition. Jackson described getting out of

---

[2]    A review of the record before us indicates that defense counsel gave an oral notice of appeal, followed by a written notice of appeal, *prior* to the State's filing of the multiple bill, Cambrice's stipulation as a second-felony offender, and the imposition of the enhanced sentence. It does not appear from the record that defense counsel filed a second motion for appeal pertaining to the multiple offender proceedings. Thus, we find that the multiple bill proceedings are not before this Court on the instant appeal.

[3]    Jackson reported a criminal history, including convictions for misdemeanor criminal damage (1996), theft of goods (2000), credit card theft (2002), monetary instrument abuse (2003), possession of counterfeit money (2003), accessory to second-degree murder (2003), and aggravated assault with a firearm (2018). Jackson confirmed that she previously used the name Lisa Edmond in the 1990s and 2000s, and she used the name "Khayda French." She denied using the name "Cookie Jackson."

the vehicle and walking away in the rain down Lapalco, when Cambrice proceeded to follow her and "try[] to hit [her] with the car." Jackson testified that she refused Cambrice's requests for her to get back into the vehicle, and declined his request to talk. Instead, when she reached the intersection of Manhattan Boulevard and Lapalco, she called a friend to come pick her up. After picking her up, Jackson's friend returned Jackson to her residence, where her mother, who had recently been discharged from the hospital, was inside. Jackson claimed that she told her mother what happened, and then called a friend, Herbert Dawson, to come change the lock on the door of the residence.

Later, Cambrice returned to the residence, and began banging on the door. When Jackson eventually opened the door, Cambrice entered and began "cutting up." Jackson recounted that Cambrice disrespected her mother, and then he cursed her and called her names. Jackson stated that, in response, she called 911 (which 911 call was played for the jury). When the police arrived, they asked Cambrice to leave the residence, but he refused, insisting it was his house. Jackson testified that Cambrice made a threat toward her, and in response, she called him a "murderer," prompting Cambrice to "walk up on [her]" while she stood in the kitchen. Jackson testified that she felt Cambrice was going to attack her as she stood there. When the police officer attempted to calm Cambrice down, he responded that the police killed "black people and all that." Cambrice became belligerent and threatened to "kill everybody in the house." At that time, the police arrested Cambrice and escorted him from the house. According to Jackson, she did not hear from Cambrice again that night.

Jackson testified that on the following day, July 25, 2020, she received a phone call from a girlfriend and decided to meet the friend for breakfast. She indicated that her mother stayed behind at the residence, but later called her at her friend's house. Based on the information relayed by her mother, Jackson stated

that she called 911 (which 911 call was also played for the jury).  After returning home, Jackson met the police and Cambrice there.  Cambrice left the premises when he was told to by the police and was instructed not to return to the property.  Despite those instructions, Cambrice later returned to the house while Jackson was on the patio talking on the phone to his sister, Robin.  Jackson testified that she heard a knock on the door and that when she saw that it was Cambrice, she let him inside, believing he was there to retrieve his things.  Instead, he told her that he was going "to show [her]."  Cambrice then exited the door.  Jackson explained that she followed him to see what he was doing.  When Cambrice proceeded to get in his car, she believed that he was leaving.  However, she relayed that Cambrice drove toward the stop sign, put the car in park, popped the trunk, retrieved a firearm, shot at her (which was captured on film by a neighbor's surveillance system and played for the jury),[4] and then drove away.  Jackson testified that she called the police once again and reported that Cambrice had just pulled a firearm and shot at her (this 911 call was likewise played for the jury).

On cross-examination, Jackson denied threatening Cambrice during the phone call with his sister.  She also denied having the gun in her possession on that date or "planting" the firearm in Cambrice's vehicle.  Jackson conceded that Cambrice did not put his hands on her.  She confirmed that, in July 2020, both her and Cambrice's names were on the lease for the Appleby residence.  Further, Jackson testified that she had never seen Cambrice with a gun in his possession prior to that day.  She denied currently owning a firearm, claiming the last time she owned one was in 2000.  She also denied owning a gun during the time she and Cambrice lived on Appleby Lane, and asserted that she had never told anyone she

---

[4]     Jackson confirmed that her neighbors had surveillance video capturing the shooting.  While the video was played for the jury, Jackson identified herself as the person with her phone near her ear, and Cambrice in the vehicle, confirming that he was the individual who shot at her.  She also identified Cambrice in open court.

had a gun, and denied showing any of her girlfriends a gun. She further denied that she was in possession of a gun in July 2020, or that she mentioned in a telephone conversation that she was going to hurt Cambrice. Jackson dismissed ever telling anyone that she "had something for [Cambrice]," implying that she was going to do something to him. Jackson recalled signing a written statement during her conversation with the police, wherein she indicated that she saw the gun in Cambrice's hand.

### Iva Goins Green

Green testified that she is Lisa Jackson's mother and that she lived with Jackson and Cambrice at 1717 Appleby Lane. Green confirmed that the police were called to the residence on July 24, 2020, after Jackson returned home upset following an argument with Cambrice, claiming that he had taken her vehicle. According to Green, Jackson told Cambrice to keep the vehicle, leave the home, and to take his belongings. Green explained that Jackson had the lock changed so that Cambrice could not enter the home. She relayed that when Cambrice returned to the home, he was "cutting up," and that the police were called again. She recalled that the police tried to calm Cambrice down and have him leave the premises for the night, but that Cambrice refused and began cursing and making death threats if he was not given a key to the house, causing the police to eventually arrest and handcuff him. Green testified that the police advised that Cambrice would be held for at least 72 hours.

According to Green, however, Cambrice returned home the following day, taking them by surprise. She explained that Cambrice arrived in Jackson's car, repeatedly leaving and coming back. Green testified that the last time he returned, she was home alone when he knocked on the door. She got scared so she called 911. She stated that when Jackson returned home, Jackson noticed that her wallet was missing, and Green explained that Jackson ran outside to retrieve it from

Cambrice. She then recalled her daughter running inside and into the bathroom shouting, "Mom, duck, Cornell shooting." She testified that she heard a gunshot, but did not see anything. Green claimed that Jackson called 911, but that she informed Jackson that she had called the police earlier. When the police arrived, they apprehended Cambrice.

On cross-examination, Green testified that Cambrice had never before been disrespectful towards her. She also denied ever seeing either Jackson or Cambrice with a gun or seeing a gun in the residence on Appleby Lane.

### *Detective Kirk Billiot*

Detective Billiot of the Jefferson Parish Sheriff's Office ("JPSO") testified that he was on patrol the night of July 24, 2020, and was dispatched to 1717 Appleby Lane. He explained that when he arrived, there was another officer on the scene. He then spoke to Jackson and her mother. Jackson told him that she and Cambrice were experiencing marital problems and that she had changed the lock on her door while Cambrice was at work. Detective Billiot testified that Cambrice then arrived at the residence and began complaining. Although Cambrice initially agreed to leave and began packing, the situation escalated to Cambrice threatening to kill everyone in the house when Jackson refused to give him a set of keys to the new lock, at which time Cambrice was arrested and removed from the home.

### *Deputy Andrew Scott*

Deputy Scott of the JPSO testified that, on July 25, 2020, he responded to a call about Cambrice trying to retrieve property from the residence on Appleby Lane. A search was made for Cambrice's cell phone, but Deputy Scott could not recall if it was found. Cambrice was asked to leave the premises and was advised to contact law enforcement before returning to the residence for future property retrievals. No arrests were made at that time.

Deputy Scott testified that he responded a second time to the residence for an alleged aggravated assault with a firearm, but Cambrice was not present when he arrived on the scene. He noted that police canvassed for evidence and were able to obtain surveillance footage from a dashcam in a nearby vehicle. The footage was played for the jury.[5] Deputy Scott explained that other officers had stopped and detained Cambrice, and that he responded to where Cambrice was being detained. After advising Cambrice of his *Miranda* rights,[6] which Cambrice voluntarily waived, Deputy Scott briefly questioned him. Cambrice admitted to an argument, but denied firing or possessing a weapon or being scared during the dispute. When Deputy Scott ran a criminal background check on Cambrice, he learned that Cambrice was a convicted felon for cocaine distribution, so he arrested Cambrice for being a felon in possession of a firearm as well as for domestic abuse aggravated assault.

### Deputy Colton O'Connor

Deputy O'Connor, also of the JPSO, testified that he responded twice to 1717 Appleby Lane on July 25, 2020. He explained that the first response was in regard to "a dispute over a cellphone" in which no arrest was made, and the second response was relative to a disturbance that was upgraded to shots fired during a domestic dispute. Deputy O'Connor testified that, while responding to the residence, he spotted a vehicle matching the description given. He then effected a

---

[5] While the video played for the jury, Deputy Scott explained that he saw Cambrice's hand pointed down toward the ground when he turned around. He stated that while he did not observe the gun go off, he heard the shot. Deputy Scott testified that Cambrice's hands were in front of him facing the house. When asked if he heard a gunshot at that time, the deputy replied, "That's what it looks like to me."

In the video, a woman is seen outside a residence on the phone, standing next to a silver vehicle. The vehicle reverses out of the driveway, turns left, and stops at a nearby stop sign. The woman walks back toward the residence while the silver vehicle remains stopped at the corner. The trunk of the vehicle opens, and the vehicle moves forward before reversing again, with the trunk still open. The driver can be seen opening the door, stopping the vehicle, and getting out as the trunk closes. He walks toward the trunk, which reopens, and retrieves something. The woman remains outside the house. The driver walks toward the residence, but his back is turned to the camera. The woman turns and screams, "Mom," and then goes inside the residence. A loud noise is heard as Cambrice turns toward the vehicle. He places an object resembling a gun into the trunk, closes it, gets back into the vehicle, and drives away.

[6] *Miranda v. Arizona*, 384 U.S. 436, 478-79, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966).

traffic stop of the silver Kia Optima at the intersection of Manhattan and Lapalco Boulevards, where the driver, later identified as Cambrice, was detained. Deputy Scott explained that the vehicle was moved to the Popeye's parking lot, and noted that no firearm was found in the vehicle.

### Detective David Angelica

Detective Angelica of the JPSO testified that he works at the Criminal Intelligence Center, which, among other things, monitors and records jail calls. He explained that certain inculpatory calls made by Cambrice were provided, and four of them were played for the jury. In one call, Cambrice was speaking with a female, presumably Jackson, and he expressed concern over whether the firearm had been found. Cambrice also discussed the incident, admitting to the female things got out of hand, that he acted out of anger, and that he had an anger problem. When the female caller accused Cambrice of shooting her, he did not deny the allegations, but promised not to hurt her.

In two other jail calls, Cambrice spoke with "Cynth" about a letter he sent concerning the firearm, outlining specific tasks he needed her to handle. In a third call, he accused the recipient of betrayal.

### Donna Quintanilla

Quintanilla, a latent print examiner with the JPSO's crime lab, was accepted by the district court as an expert in the field of latent print processing and comparison. She explained the process of latent print examination to the jury. She also described prints taken from Cambrice at various different times (*i.e.*, prints contained in the certified conviction packet for Cambrice's conviction for distribution of cocaine on November 5, 2003, a fingerprint card from the Automated Finger Identification System associated with that arrest) and their comparison to prints she had obtained from Cambrice the previous day. Further, Quintanilla explained how those prints sufficiently matched for comparison

purposes to identify Cambrice and to establish his status as a felon prohibited from possessing firearms.[7]

### Nancy Clay

Clay testified that she works at the JPSO's 911 Call Center and processes all 911 call recordings. Clay explained the process of how a 911 call is recorded and preserved.

### Nigel Cambrice

Nigel Cambrice testified that she is Cambrice's daughter, but was not at the 1717 Appleby Lane residence on either occasion at issue herein. She stated that after Cambrice was arrested, he sent her a letter containing a map as to where the firearm involved in this case could be located. Nigel testified that she took the letter to Cambrice's sister, Cynthia, and asked for her help to retrieve the firearm. She explained that Cambrice had hidden the gun by a ditch under some rocks at a described location. Nigel stated that she and Cynthia went to that location, that Cynthia recovered the firearm, and that Cynthia turned over both the firearm and letter to the police. Nigel denied that she would be able to identify the gun if it were shown to her.

### Detective Kirk Billiot

Detective Billiot was recalled as a witness and testified that he received a phone call about a firearm being found by Cambrice's family based on a letter he sent from jail, which included instructions and a map indicating where to locate the firearm. Detective Billiot explained that he responded to the Popeye's at the corner of Manhattan and Lapalco Boulevards and collected the letter and the gun, a .357 Magnum revolver. He further explained that when this particular gun is fired,

---

[7] The certified conviction packet reflected Cambrice's plea to distribution of cocaine as a second felony offender on November 3, 2003, and a sentence of seventeen years and six months imprisonment handed down on November 5, 2008. Quintanilla confirmed that this sentence would carry into 2020 and 2021. According to Cambrice's own testimony, he acknowledged that he served "sixteen years flat" on that conviction and sentence.

the casings remain inside the gun, which explains why no casings were recovered by law enforcement at the scene.  Photographs of the gun were taken, showing how it was loaded.  Detective Billiot explained that the gun contained four live rounds and one spent casing, confirming that one of the rounds had been fired.  He agreed that the ballistic evidence indicated one shot had been fired from the gun.

The defense called the following witnesses to testify at trial.

### Robin Truly

Truly testified that she is Cambrice's sister and that she was on the phone with Jackson on July 25, 2020, the day of the incident at 1717 Appleby Lane.  According to Truly, Cambrice and Jackson were arguing while Cambrice was gathering his things, and she was trying to calm Jackson down.  She advised Jackson to let Cambrice "get his stuff" and leave.  Truly recalled that Jackson threatened to "get [her] gun," then placed the phone down, but did not return to the call.  Truly testified that she felt uncertain about how to handle the situation due to Jackson and Cambrice's marital problems.  She stated that she did not go over to the house and did not inform law enforcement because she did not want to get involved.

### Cornell Cambrice

Cambrice testified in his own defense.  He admitted to being a convicted felon who was sentenced to seventeen-and-a-half-years imprisonment for distribution of cocaine, and acknowledged that he "did sixteen years flat" on that conviction and sentence.[8]  Cambrice stated that Jackson was his wife and that he knew about her past involvement with gun violence.

---

[8]     In addition, Cambrice testified that he had been convicted for possession of stolen property, and that he pled guilty to distribution of cocaine within one thousand feet of an elementary school.  He also confirmed his 1990 conviction for cocaine possession and his 2001 conviction in Houston for "assault, threatening bodily injury."  Cambrice conceded that as a convicted felon, he should not have possessed a firearm in July 2020.

In describing the events that occurred on July 24, 2020, Cambrice explained that he and Jackson argued while in the car as she was taking him to get his ID, because he had lost his wallet and needed his Walmart cards that were in Jackson's possession. He claimed that he reached for Jackson's purse to get the cards, but she grabbed it and exited the vehicle. It was raining when Jackson began walking. He testified that he tried to calm her down and attempted to get her to return to the car. He denied that he tried to run her over or harm her.

According to Cambrice, he became upset and started drinking. He stated that he returned to the residence on Appleby Lane, which he leased with Jackson, but she was not there. As he was leaving, he claimed that Jackson returned with a man he had never met, and that his mother-in-law spoke to the man. He testified that he left the residence for about twenty minutes and when he returned, the lock had been changed, which admittedly caused him to become upset. Cambrice described banging on the door until Jackson let him in, at which point he "acted a fool." He testified that the situation escalated and that his alcohol consumption played a role. He confirmed that he was arrested that night and released from jail the following morning.

Cambrice testified that he walked home from the jail, entered the residence through the unlocked garage door, and learned that Jackson was not there. He claimed that he asked his mother-in-law to call Jackson to find out where his cell phone was located, but denied that he was "banging and cutting up" when he did so. He confirmed that he had the keys to the vehicle. He could not recall for certain whether he left and returned to the residence. Cambrice testified that "some kind of way [he] ended up" with Jackson, the man who changed the lock the night before, and the police at the house. Cambrice remembered that he only wanted to retrieve his cell phone and some clothes before leaving. He told Jackson that he needed his phone and wanted to get his clothes so they could retrieve her

vehicle. According to Cambrice, Jackson cried and said she did not have the phone. One of the officers asked Jackson to dial the number, but she said no one answered. The police instructed Cambrice to leave the residence, and he did. He denied being told to come back with the police if he wanted his property.

Camrbice testified that when he left his house, he went to his sister's house, but when no one answered, he returned home. At that time, the police were gone, and Jackson let him in while she was holding a gun. He was startled to see her holding a gun and knew he needed to stay calm. He asked to get his clothes and leave. He claimed that he went to the back of the house to gather a few items and noticed the gun on the dining room table. He explained that Jackson was still upset, telling him she was "going to show [him]." Cambrice testified that as he was leaving through the garage door, he noticed Jackson smoking in the screened-in patio at the back of the house and that she was on the phone. Seeing the gun on the table, he picked it up. He then clarified that when he saw the gun, it was cocked, so he took it and placed it in the trunk of the car. He explained that Jackson was unaware he had moved the gun. He returned inside the house to grab his bag, when he saw Jackson coming from the patio, still on the phone with his sister, Robin Truly.

Cambrice testified that it was not his intent to hurt anyone when he removed the gun from the house, but rather, he did so to keep himself from getting hurt. He claimed that he asked Jackson to let him speak with his sister, but she told him to "get out of there" and refused to hand him the phone. He decided that since his sister was home, he had somewhere to go and did not need the phone, so he jumped in the vehicle and left the residence. He confirmed that in the video, Jackson stood outside the car. He explained that while he was backing out of the driveway, Jackson was still screaming and calling him names. He testified that he then realized he was a convicted felon and had no business with a gun, so he

changed his mind and backed up. He explained that his intention was to remove the gun from the trunk, bring the gun inside and give it to his mother-in-law, and then leave. He elaborated that this was why he backed up and grabbed the gun from the trunk.

Cambrice conceded that the video showed him getting out of the vehicle and removing the gun from the trunk. He denied that he pointed, raised, or aimed the gun at Jackson, although she claimed otherwise. He recalled that when Jackson saw the gun in his hand, she was startled, screamed, and ran inside. As she screamed and slammed the door, Cambrice claimed he became nervous, which caused the gun to accidentally go off. In a panic, he jumped in the vehicle and left. He clarified that when the gun went off, it was not aimed at Jackson, the house, or the vehicle. He asserted that he kept the gun pointed at the ground the entire time, including when it went off, and that he never raised it.

Cambrice stated that when he left the residence, he stopped by a canal and hid the gun under a nearby rock. He claimed that he got back in the vehicle and was on his way to his sister's house when the police stopped and arrested him. Cambrice denied that he spoke with Detective Scott. He admitted writing the letter from jail to his sister. According to Cambrice, he began thinking about the gun's location and recalled that children often visited the pond to search for turtles. Concerned about the risk of a child finding the gun, he decided to write the letter to someone he trusted to not turn the gun in, or to get him or Jackson in trouble. Cambrice denied that his fingerprints were on either the gun or bullets, and claimed that authorities were making it appear that he had threatened to kill everyone in the house, which he denied. He acknowledged, "[I]t looks like that, but that's not what it was." Cambrice confirmed the gun was later handed over to the police.

**ASSIGNMENT OF ERROR**

On appeal, Cambrice argues the trial court erred in refusing to charge the jury on the defense of justification as authorized by La. R.S. 14:18, and in denying the motion for new trial predicated on the same error.

**DISCUSSION**

At trial, Cambrice requested a special jury charge for the defense of justification and self-defense. The defense of justification is generally set out in La. R.S. 14:18, which states, in pertinent part:

> The fact that an offender's conduct is justifiable, although otherwise criminal, shall constitute a defense to prosecution for any crime based on that conduct. This defense of justification can be claimed under the following circumstances:
>
> *   *   *
>
> (7) When the offender's conduct is in defense of persons or of property under any circumstances described in Articles 19 through 22.

Here, Cambrice was charged with a violation of La. R.S. 14:95.1, which prohibits an individual convicted of certain crimes, including Cambrice's predicate crime of distribution of cocaine, from possessing firearms. The Louisiana Supreme Court in *State v. Blache*, 480 So.2d 304 (1985), recognized an exception where self-defense can justify the possession of a firearm by a convicted felon, stating:

> [W]hen a felon is in imminent peril of great bodily harm, or reasonably believes himself or others to be in such danger, he may take possession of a weapon for a period no longer than is necessary or apparently necessary to use it in self-defense, or in defense of others. In such situation justification is a defense to the charge of felon in possession of a firearm.
>
> This is not to say that a convicted felon is entitled to own or maintain possession of a weapon, constructive possession or otherwise, for protection, or for any other reason.

*Id.* at 308; *see also State v. Lewis*, 98-447 (La. App. 5 Cir. 10/28/98), 720 So.2d 1230, 1232.

When justifiable use of force is raised as a defense in a non-homicide case, the defendant bears the burden of proving such justification by a preponderance of the evidence. *See State v. Barnes*, 491 So.2d 42, 47 (La. App. 5 Cir. 1986); *State v. McKinney*, 19-380 (La. App. 5 Cir. 12/26/19), 289 So.3d 153, 164. Thus, in order to prove the defense of justification, Cambrice bore the burden of showing by a preponderance of the evidence that he was in imminent peril or great bodily harm or reasonably believed himself or others to be in such danger. Even so, he could only have taken possession of the weapon for a period no longer than was necessary or apparently necessary to use it in self-defense or in defense of others. *Blache*, 480 So.2d at 308.

During the jury charge conference held in the instant matter, defense counsel informed the district court of a proposed jury instruction on justification under La. R.S. 14:18. In response, the court advised that justification requires proof of an imminent threat or force and that the person threatened had no reasonable alternative but to possess the firearm. The court explained that a defendant must demonstrate imminent peril of great bodily harm or a reasonable belief of such danger to himself or others, allowing possession of a weapon only as long as necessary for self-defense. The court further explained that it was not certain, given the testimony thus far, that justification was an appropriate charge for the jury. Because Cambrice had not yet testified, the district court reserved ruling on the jury instruction at that time.

After Cambrice's testimony, the district court ruled that it would remove the justification charge from the jury instructions, due to the lack of evidence of fear or immediate threat of bodily harm. The district court also issued a written order

denying Cambrice's request for jury instructions on self-defense and justification, providing the following reasoning:[9]

> Having heard the testimony of the defendant that: the defendant discovered a firearm left unattended on a table inside of the home; the victim existed [sic] to a patio area, presumably to smoke a cigarette; and that the defendant then confiscated the firearm and secured it in the trunk of his vehicle when the crimes at issue herein occurred, this Court finds that the defendant has not shown an immediate or imminent threat, and, therefore, the defendant's requested jury charges were excluded. The Court herein relies upon *State v. Lee*, 782 So.2d 1063 (La. App. 5th Cir. 1/30/2001),[10] and distinguishes the case cited by defendant, *State v. Blache*, 480 So.2d 304 (La. 1985).

In short, the district court found, based on Cambrice's own testimony, that there was neither an "imminent" threat nor a "reasonable belief" of an "imminent" threat for purposes of applying *Blache*.

Following trial, defense counsel filed a motion for new trial, and while counsel argued the verdict was contrary to the law and evidence, the primary argument of counsel centered on the district court's failure to instruct the jury on La. R.S. 14:18, thereby denying Cambrice the opportunity to have the jury consider justification under that statute for the charge of possession of a firearm by a convicted felon. Counsel asserted that Cambrice entered the family home and saw his estranged wife, a convicted felon with a history of violent crimes involving firearms, holding a gun. Cambrice, who did not own or possess any weapons, became fearful and gathered his things to leave. When his wife placed the firearm

---

[9]     Cambrice sought this Court's emergency supervisory review challenging the district court's order. This Court denied the writ application "[o]n the showing made," as a transcript had not been provided and it could not be determined from the application itself whether the district court had abused its discretion when it denied Cambrice's request for the jury instruction on justification.

[10]     In *State v. Lee*, 00-1253 (La. App. 5 Cir. 1/30/01), 782 So.2d 1063, *writ denied*, 01-831 (La. 2/1/02), 808 So.2d 338, this Court upheld the exclusion of the "*Blache* defense" and evidence to support a "*Blache* defense" because the evidence presented at trial court not have satisfied the jurisprudential standard. *See also State v. Tassin*, 11-1144 (La. App. 5 Cir. 12/19/13), 129 So.3d 1235, *writ denied*, 14-284 (La. 0/19/14), 148 So.3d 950 (no error in excluding self-defense instruction because the evidence "does not permit a reasonable inference that defendant acted in self-defense"); *State v. Mayes*, 14-683 (La. App. 3 Cir. 12/23/14), 154 So.3d 1257, *writ denied*, 15-178 (La. 11/16/15), 184 So.3d 24 (no error in failure to give instruction because defendant was not in "imminent peril" as per *Blache*).

on a table, Cambrice, believing he was in danger, took the gun and placed it in the trunk of a car. Counsel argued that it was the jury's right—not the court's—to decide if these circumstances met the statutory criteria for justification, and the jury should have been given the instruction. Prior to sentencing that same date, the trial judge denied defense counsel's motion for new trial.

Louisiana Code of Criminal Procedure article 802 mandates that the district court instruct the jury on the law applicable to each case. The district court is required to charge the jury on the law applicable to any theory of defense, when properly requested, which the jurors could reasonably infer from the evidence. *State v. Ball*, 12-710 (La. App. 5 Cir. 4/24/13), 131 So.3d 896, 900, *writ denied sub nom. State ex rel. Ball v. State*, 13-1329 (La. 11/8/13), 125 So.3d 450, and *writ denied*, 13-1139 (La. 11/15/13), 125 So.3d 1103. La. C.Cr.P. art. 807 further mandates that a requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly pertinent and correct. It need not be given if it is included in the general charge or in another special charge to be given. *State v. Batiste*, 06-824 (La. App. 5 Cir. 3/13/07), 956 So.2d 626, 636, *writ denied sub nom. State ex rel. Batiste v. State*, 07-892 (La. 1/25/08), 973 So.2d 751.

As a general matter, a district court has the duty to instruct the jurors as to "every phase of the case supported by the evidence whether or not accepted by him as true" and that duty extends to "any theory ... which a jury could reasonably infer from the evidence." *State v. Joseph*, 23-446 (La. App. 5 Cir. 4/24/24), 386 So.3d 688, 693 (citing *State v. Neal*, 00-674 (La. 6/29/01), 796 So.2d 649, 659, *cert denied*, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002)). This evidence presented at trial, however, must support a requested written charge for the jury. *Id*. A district court's failure to give a requested jury instruction constitutes reversible error only when there is a miscarriage of justice, prejudice to the

substantial rights of the accused, or a substantial violation of a constitutional or statutory right. *Id*.

The decision on a motion for new trial rests within the discretion of the district court. *State v. Williams*, 18-112 (La. App. 5 Cir. 11/7/18), 259 So.3d 563, 578, *writ denied*, 18-2038 (La. 4/22/19), 268 So.3d 295. The ruling will not be disturbed on appeal absent a clear showing of an abuse of discretion. *State v. Barrosse*, 23-393 (La. App. 5 Cir. 4/17/24), 386 So.3d 333, 337.

Based on our appellate review of the record, we find the district court did not err in its determination that the evidence presented at trial does not support a theory of self-defense and, thus, Cambrice was not entitled to a self-defense jury instruction. Specifically, Jackson testified that on July 25, 2020, Cambrice shot at her outside of their residence. After an argument with Cambrice, he left the house, got into his vehicle, reversed it toward the stop sign, and parked. He then opened the trunk, retrieved a gun, pointed it at Jackson, and fired a shot towards her. Jackson recalled that she fled inside, feeling scared. She denied having ever seen Cambrice with a gun before the incident and denied owning a firearm herself. Jackson's mother, Green, corroborated the shooting, stating that her daughter ran inside, saying, "Mom, duck, Cornell is shooting." Surveillance footage from a nearby vehicle captured Cambrice's actions leading up to the shooting. Later, a family member found the .357 Magnum revolver based on instructions from a letter Cambrice sent from jail. The police collected the gun, which contained one spent casing and four live rounds, confirming that a shot had been fired.

Even accepting Cambrice's testimony as true, the proposed jury instruction of justification does not apply to the instant case as there is no indication that he was in imminent peril of great bodily harm or that he reasonably believed he was in such danger that he needed to take possession of a weapon for self-defense. The record shows that Camrbice's sister testified that she was on the phone with

Jackson during an argument, and Jackson told her, "I'm going to get my gun," before leaving the call. Cambrice admitted that he saw the gun on the dining room table while Jackson was outside on the porch, talking on the phone. He stated that he removed the gun from the house, placed it in the trunk of his vehicle, and then intended to return it to his mother-in-law. Cambrice claimed he did not intend to hurt anyone and that he removed the gun solely to protect himself from getting hurt. He also admitted possessing the gun after removing it from the residence and then hiding it under a rock by the canal. He explained that he hid the gun under a rock because he feared the police would arrive and mistakenly shoot him for having it. He wanted to avoid getting arrested and believed that hiding the gun would prevent further complications for both him and Jackson.

There is simply no evidence in the record that would support a jury charge on justification. Consequently, there was no abuse of discretion by the district court in denying Cambrice's request for a jury charge on the defense of justification. We find there was no miscarriage of justice, no prejudice to the substantial rights of Cambrice, and no occurrence of a substantial violation of a constitutional or statutory right. For the same reasons, we find no abuse of discretion by the district court in denying Cambrice's motion for new trial.

**ERROR PATENT DISCUSSION**

The record was reviewed for error patent according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990). We found no errors requiring corrective action.

**CONVICTION AFFIRMED**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **DECEMBER 18, 2024** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 24-KA-153

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE NANCY A. MILLER (DISTRICT JUDGE)
KATHERINE M. FRANKS (APPELLANT)     DARREN A. ALLEMAND (APPELLEE)     JULIET L. CLARK (APPELLEE)
THOMAS J. BUTLER (APPELLEE)

**MAILED**
HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
LINDSAY L. TRUHE (APPELLEE)
ASSISTANT DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053